Lloyd L. DOWNING, M. D.,
Plaintiff-Appellant,

v.

R. Allen WILLIAMS, Superintendent, et al., Defendants-Appellees.

No. 78–2869.

United States Court of Appeals,
Fifth Circuit.

Aug. 21, 1980.

Ainsworth, Circuit Judge, filed a dissenting opinion.

---

John A. Buckley, Texarkana, Tex., for plaintiff-appellant.

Martha H. Allan, Lonny F. Zwiener, Asst. Attys. Gen., Austin, Tex., for defendants-appellees.

Before TUTTLE, AINSWORTH and SAM D. JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by a plaintiff physician from a jury verdict for the defendants in a 42 U.S.C. § 1983 suit for damages and injunctive relief in which the physician alleged that his procedural due process and first amendment rights had been violated. We reverse the judgment.

Lloyd Downing was the only staff psychiatrist at the San Angelo Center, a Texas state mental health and mental retardation facility. It appears that over the years he worked there, he had doubts about the quality of care patients were receiving at the Center. He made complaints about the facility to the Justice Department, the state of Texas, and the American Psychiatric Association. On several occasions, he wrote comments critical of patient care on the patients' medical charts. Several times he was told to bring his criticisms to the administrator of the institution, rather than speaking to staff about these problems, or writing on medical records of patients.

On May 31, 1977, R. Allen Williams, superintendent of the facility met with Dr. Downing for about six hours to discuss his conduct and to deliver a letter to him. The letter advised Dr. Downing of the concerns of Dr. Williams concerning Dr. Downing's difficulties relating with staff resulting from the written comments in medical records which Dr. Williams felt were not appropriate to a patient's treatment. Dr. Downing was told that he must follow two directives in order to continue his employment at the Center. These directives were:

1. You will immediately cease editorializing through unusual and uncustomary statements in the clinical records of the clients of this facility.

2. I will insist that you follow administrative channels to state your personal concerns regarding staff and programs in lieu of editorializing in the clinical records.

On June 16, 1977, a patient at the San Angelo Center suffered cardiac arrest and had to wait approximately 45 minutes for an ambulance. Dr. Downing made the following entries on the patient's chart:

No suction

No resusc. equipment

No emergency ambulance available

Gross neglect

Would have to suction *by mouth* (emphasis in original.)

He also referred the incident to the acting superintendent and to a doctor on the Quality Review Committee.

Four days later, Dr. Williams met again with Dr. Downing and told him that the June 16 entries were in violation of the May 31 directives and gave him a letter telling him he was fired. The letter explained that his termination was due to "deliberate insubordination" which had destroyed his effectiveness to relate to other staff. *See* note 11, *infra*.

After the termination Dr. Downing asked for an administrative hearing. What he was offered was a hearing before the grievance committee under the Rules of the Commissioner of the Texas Department of Mental Health and Mental Retardation. He did not pursue the opportunity for such a hearing.

In his complaint, Dr. Downing alleged that his procedural due process rights under the fourteenth amendment of the United States Constitution were violated because he was never properly confronted with the factual charges against him, offered an opportunity to be heard in his defense, or afforded other basic procedural rights. He also charged that the May 31 letter restricted his first amendment rights and that he was fired for exercising those rights. He sued the defendants in their individual and official capacities.[1] He sought an injunction requiring the defendants to reinstate him and barring them from firing him for the exercise of his first amendment rights and without providing him due process. He also requested damages for loss of earnings during the period he was fired.

At trial, on the basis of special verdicts the jury found that Dr. Downing was dismissed with good cause;[2] that he was provided with written notice of the reasons for his dismissal and an effective opportunity to respond to the charges before his superiors;[3] that he waived his rights to notice and a conference before his superiors;[4] that the grievance procedure did provide Dr. Downing with an effective opportunity to respond before an impartial decision maker[5] and that Downing waived that right also.[6] The jury was also provided with instructions as to how the court viewed the applicable law.[7] The trial judge

1. The named defendants were R. Allen Williams, Superintendent; Dr. James White, Medical Director, San Angelo Center and Dr. John Kavanaugh, Acting Commissioner, Texas Department of Mental Health-Mental Retardation.

2. Special issue number one said:
    "Do you find from a preponderance of the evidence that Dr. Downing was dismissed from his employment by the defendants with good cause?
    Answer: "He was dismissed with good cause"
    or
    "He was dismissed without good cause."
    The plaintiff, Dr. Downing, could be dismissed for good cause if the preponderance of the evidence satisfies you that his dismissal resulted from his actions which created a substantial disruption or dissatisfaction among the other employees so as to substantially interfere with the efficient function and operation of the center, or was not in accord with ordinary medical standards to the extent that it was detrimental to the welfare of the patients.
    On the other hand, if the evidence satisfies you that Dr. Downing's dismissal resulted from his criticisms of the operation of the center and of its employees, which criticism did not create any substantial disruption or dissatisfaction among the employees or did not substantially interfere with the efficient function and operation of the hospital and was not adverse to the welfare of the patients, then the dismissal would be without good cause.

3. Special issue number 2(a) said:
    "(a) Do you find from a preponderance of the evidence that the acts of the defendants did not provide the plaintiff prior to his dismissal with written notice of the reasons for his dismissal and an effective opportunity in a conference before his superiors to respond to the charges upon which the decision to terminate plaintiff's employment was based?"

Answer: "They did not provide such notice and an effective opportunity to respond"
    or
    "They did provide such notice and an effective opportunity to respond."

4. Special issue number 2(b) said:
    "(b) Do you find from a preponderance of the evidence that Dr. Downing waived his right to such notice and a conference before his superiors?"
    Answer: "He did waive the right"
    or
    "He did not waive the right."

5. Special issue number 2(c) said:
    "(c) Do you find from a preponderance of the evidence that the grievance procedure as shown by plaintiff's exhibit 1 did not provide the plaintiff with an effective opportunity in a hearing to respond before an impartial decision maker to the charges against him?"
    Answer: "It did not provide an effective opportunity to respond before an impartial decision maker"
    or
    "It did provide an effective opportunity to respond before an impartial decision maker."

6. Special issue number 2(d) said:
    (d) Do you find from a preponderance of the evidence that Dr. Downing waived his right to such an effective opportunity to respond in a hearing before an impartial decision maker?"
    Answer: "He did waive the right"
    or
    "He did not waive the right."

7. Those instructions said:
    "You are further instructed that where a governmental employer chooses to postpone the opportunity of a non-probationary employee, such as Dr. Downing was, to secure a full

concluded that there was sufficient evidence to support all of what he described as "the jury's findings of fact in this case." He therefore ruled that all the "prerequisites of Constitutional due process were afforded to the plaintiff" and that his rights of free speech were not violated. It is from that judgment that Dr. Downing appeals.

In this appeal, Dr. Downing raises the same two issues he raised at trial—the procedural due process issue and the first amendment issue. The state argues here that a suit for damages against these defendants in their official capacity is a suit against the state of Texas and is barred by the eleventh amendment to the United States Constitution. We will examine each of these issues in turn.

## I

### Procedural Due Process Claims [8]

■ As a preliminary matter, we note that we are not bound by the jury's findings that Dr. Downing was provided, prior to his dismissal, with adequate written notice and an opportunity to respond to his superiors, or its finding that he waived that right, if the jury finding was wrong as a matter of law. Likewise, we are not bound by the jury's determination that the grievance procedure provided for a hearing before an impartial decision maker, or that Dr. Downing waived this right. While a

jury can certainly determine contested issues of fact, it cannot make determinations of law, such as whether Dr. Downing "waived" his rights, or was provided "adequate" notice. These determinations of how constitutional standards are to be applied to the case at hand can only be made by the judge since they are questions of law. *Cf. Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

We are faced here with two procedural due process issues related to the termination of Dr. Downing's employment. First, we must examine whether such pre-termination procedures as are required were implemented in this case, and whether Dr. Downing waived those procedures. Second, we must examine the post-termination procedures provided to Dr. Downing and decide whether he waived his right to them also.

The procedural safeguards embodied in the fifth and fourteenth amendments "have their historical origins in the notion that conditions of personal freedom can be preserved only when there is some institutional check on arbitrary governmental action." Tribe, *American Constitutional Law* 501 (1978). These safeguards have been applied to give any individual "the right to be heard before being condemned to suffer grievous loss of any kind [9]" as a result of governmental actions which affect the range of interests defined as "life," "liber-

---

evidentiary hearing until after his dismissal, the employee must, prior to termination, be given written notice of the reasons for termination and an effective opportunity to rebut those reasons.

In answering the above Special Issue No. Two, you are instructed that an 'effective opportunity to respond' means that prior to dismissal, an employee is given the right to respond in writing to the dismissal charges against him and the right to respond orally before the employer who is responsible for making the dismissal decision.

Either failure to give such written notice prior to termination or failure to give an effective opportunity to respond to those reasons, would require you to answer the above special issue in the negative, but if the evidence satisfies you that both of these elements are present you may answer the foregoing special issue in the affirmative.

If you have found in answering Special Issue No. One that the plaintiff was dismissed with good cause, and in Special Issue No. Two(a) and (c) that the acts of the defendants and the grievance procedure did provide the required notice and an effective opportunity to respond, you may cease your deliberations, but if you have answered either of the issues otherwise proceed to answer the following issues."

8. The appellant argues here that he had two constitutionally protected interests at stake in this controversy—a liberty interest in speech and a property interest in continued employment. In this portion of the opinion, we will deal only with the procedural due process required before his job could be terminated.

9. *See Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring.)

**618**

ty," or "property" under the fifth and fourteenth amendments.[10]

It is clear that the existence of a legitimate property or liberty interest is a prerequisite to the examination of any claimed threat of due process. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Thurston v. Dekle*, 531 F.2d 1264, 1271 (5th Cir. 1976), *vacated on other grounds* 438 U.S. 701, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978). In this case, Dr. Downing was a non-probationary governmental employee. Since he had an expectation of continued employment, it is undisputed by either side here that his employment, a property right, could not be taken away without compliance with the requirements of procedural due process. *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970).

Having determined that Dr. Downing had a cognizable procedural due process claim, we must examine what procedures

had to be accorded to him before he could be terminated. In *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), this Court said that

[w]here a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include, prior to termination, written notice of the reasons for termination and an effective opportunity to rebut these reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.

*Id.* at 1273 (footnotes omitted.) *See also Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980).

In this case, Dr. Downing was given a letter informing him of the reasons he was fired.[11] This letter was given to Dr. Down-

---

**10.** The courts have traditionally approached this question by adopting an instrumental view of procedural due process, focusing on the necessity of these procedures so as to minimize mistakes, or unfair deprivations. But it has been recognized that the philosophy behind the procedural due process protections encompasses more than the notion that the law must be implemented fairly. As one noted constitutional scholar has written:

> One approach begins with the proposition that there is *intrinsic* value in the due process right to be heard, since it grants to the individuals or groups against whom government decisions operate the chance to participate in the processes by which those decisions are made, an opportunity that expresses their dignity as persons. From this perspective, the hearing may be considered both as a "mode of politics," and as an expression of the rule of law, regarded here as the antithesis of power wielded without accountability to those on whom it focuses. Whatever its outcome, such a hearing represents a valued human interaction in which the affected person experiences at least the satisfaction of participating in the decision that vitally concerns her, and perhaps the separate satisfaction of receiving an explanation of why the decision is being made in a certain way. Both the right to be heard from, and the right to be told why, are analytically distinct from the right to secure a different outcome; these rights to interchange express the elementary

idea that to be a *person*, rather than a *thing*, is at least to be *consulted* about what is done with one. Justice Frankfurter captured part of this sense of procedural justice when he wrote that the "validity and moral authority of a conclusion largely depend on the mode by which it was reached. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done." At stake here is not just the much-acclaimed *appearance* of justice but, from a perspective that treats process as intrinsically significant, the very *essence* of justice. [Emphasis in original.]

Tribe at 502–03 (footnotes omitted).

**11.** That letter said:

June 20, 1977

Dear Dr. Downing:

It has recently been called to my attention that you have failed to comply with the two administrative directives contained in my letter to you dated May 31, 1977.

It is apparent that your recent actions constitute deliberate insubordination, and furthermore, these actions have created a situation in which you have destroyed your effectiveness in your ability to relate to other staff.

ing at the end of a conference with Dr. Williams, at which Dr. Williams attempted to discuss the June 16 statements in the medical records with Dr. Downing and Dr. Downing refused to discuss them. Dr. Williams testified that before Dr. Downing came to the meeting, an agreement had been reached that if Dr. Downing had in fact made the entry "gross neglect," he would be fired.

■ We find that the pre-termination procedure accorded to Dr. Downing did not accord with the requirements of procedural due process as set out in *Thurston*. Even though Dr. Downing was given the written reasons for his termination, he was not given an adequate opportunity "to respond in writing to the charges made," *Thurston* at 1273, since he was fired effective at 5 p. m. on the day he received the letter. That length of time did not provide him with an adequate opportunity to respond in writing to the charges made against him. While we do not address here specifically how much time Dr. Downing should have been afforded to prepare a response, it is clear that a few hours notice was insufficient.

■ Nor do we find that Dr. Downing waived his right to respond in writing to these charges, because he refused to respond during the conference with Dr. Williams. He was not given the letter until the close of the conference, so any inferences about his failure to respond before he was told he was terminated cannot be used against him on this point. More importantly, provision of adequate time to respond was not a right he could waive. It was up to the employer to provide Dr. Downing with the necessary time to respond, whether he desired to respond or not. We therefore find that Dr. Downing's pre-termination procedural due process rights were violated.

■ As to the post-termination proceedings, Dr. Downing argues that the griev-

ance procedure provided to him did not comport with procedural due process because he was not provided an adequate statement of the charges against him, and the proceedings were before a non-neutral decision maker. The state of Texas argues, in opposition, that the grievance procedure provided was adequate, and argues further that Dr. Downing waived his right to this hearing.

We agree with Dr. Downing as to his contention about the adequacy of the statement of charges. In *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970) this Court, faced with a similar question of the procedural due process requirements of a post-termination employment hearing, said:

. . . the standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved.

Within the matrix of the particular circumstances present when a teacher who is to be terminated for cause opposes his termination, minimum procedural due process requires that:

(a) he be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist;

(b) he be advised of the names and the nature of the testimony of witnesses against him;

(c) at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense;

(d) that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges. . .

Consequently, in order to fulfill my obligation as the Superintendent of this facility, you are hereby notified that your employment with San Angelo Center is being terminated effective 5 p. m. June 20, 1977.

Respectfully,

R. Allen Williams
Superintendent

*Id.* at 856. While the factual circumstances in this case are obviously somewhat different from the dismissal of a teacher, the same general principles remain important. Factors (a) and (c) listed in *Ferguson* are part of any procedural due process protection because they provide the individual with the right to be heard and the right to hear the reasons why he was terminated. Factor (b) is a variant of the requirement of *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) that "the decision maker should state the reasons for his determination and indicate the evidence he relied on . . . ." *See also Robbins v. U. S. R. R. Retirement Bd.,* 594 F.2d 448, 452 (5th Cir. 1979). As to factor (d), the Supreme Court has traditionally put a great emphasis on the neutrality of the decision maker. *See Arnett v. Kennedy,* 416 U.S. 134, 197, 94 S.Ct. 1633, 1665, 40 L.Ed.2d 15 (1974) (White, J., concurring in part and dissenting in part.)

In this case, the grievance procedures used by the San Angelo State Center and afforded to the plaintiff were constitutionally deficient. While Dr. Downing was afforded some notice of the reasons for his dismissal, this notice was not detailed enough to allow him to prepare a defense or show that an error had been committed. The June 20 letter (*see* note 11), the only written communication he received from the Center concerning his termination, may have been detailed enough to meet the more lenient pre-termination standards of *Thurston* but it does not meet the stricter standards of detailed notice for the more extensive post-termination hearing which was required here.[12]

In *Thurston,* this Court, in discussing pre-termination due process requirements, spoke of the government's interest in efficient city operation. 531 F.2d at 1272. The Court said that "[i]deally, the balance would seek to minimize the risk of wrongful ter- mination to an employee without burdening the government with elaborate pre-termination proceedings." *Id.* at 1273. But after the employee has been terminated, the government's interest is much less strong. The employee causing the problem is no longer on the staff. Wages are no longer being paid to him. At that point, the government has an affirmative obligation to provide the discharged employee with enough detailed information so that he can prepare an adequate rebuttal. In this case, the San Angelo Center did not provide such information. The letter Dr. Downing received spoke only of "deliberate insubordination," without specifying the incidents and the conduct for which he was fired. Without this detailed information, it was clearly impossible for Dr. Downing to prepare an adequate rebuttal, or to know exactly why he was fired. He was entitled to such an explanation.

In addition, under the grievance procedure used by the San Angelo Center, it was up to Dr. Downing to present his grievance in writing. Such a grievance had to contain a statement of his complaint and the relief sought. It is difficult to see how he could prepare this statement adequately without further detailed information as to why he was fired. Forcing him to set out the reasons why he thought he was fired to the grievance committee, to set in motion the grievance process, also placed a responsibility on Dr. Downing which was properly the responsibility of the Center. It was up to the Center to tell him the specific reasons why he was fired.

■ Dr. Downing also argues that the grievance procedure was not neutral because the grievance committee made its recommendations to Dr. Williams, the superintendent and the man responsible for firing him. We disagree with this contention. Although the Supreme Court has set out a

---

12. We do not reach the question of whether the June 20 letter was detailed enough to meet the pre-termination standards of *Thurston* in this case, because we have already found that Dr. Downing's procedural due process rights were violated because he was not afforded enough time to respond.

strict standard in this area,[13] we find no conflicts of interest in this case from either a personal or institutional standpoint that rise to the level of a constitutional violation.

On the personal level, it is clear that Dr. Williams was not the one charged with the sole responsibility of making a decision in this case. Although appointed by the superintendent, the grievance committee was a standing committee of employees that heard all such cases. While Dr. Williams would have been the person to whom the recommendation of the grievance committee was made, there was an appeal channel to the Deputy Commissioner and the Commissioner of Mental Health and Mental Retardation. These procedures were sufficient to insure that Dr. Downing would have his grievance treated fairly.

There was also no appearance of partiality. *Cf. Mayberry v. Pennsylvania,* 400 U.S. 455, 469, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971) (Harlan, J., concurring). On an institutional level, it is clear that the case was not decided by staff members who had dealt with the case on a close personal basis. Therefore that aspect of neutrality was not violated either.[14]

The state also argues here that Dr. Downing waived his right to these required post-termination procedures. Dr. Downing was given a copy of the grievance procedures on the day he was terminated. On advice of counsel, he ignored the grievance mechanism which was offered to him.

■ We hold that Dr. Downing did not waive his rights to post-termination hearings by his failure to invoke these grievance procedures. Since the Center never adequately presented Dr. Downing with the reasons why he was fired, there was no obligation on his part to file a grievance. As stated previously, Dr. Downing was never informed of the precise reasons why he was terminated. It is difficult to see how he could file a grievance without this basic information. The Supreme Court has said that even in non-criminal proceedings, the courts should "indulge every reasonable presumption against waiver" of an essential right. *Aetna Insurance Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed.2d 1177 (1937). We hold that in this case Dr. Downing could not waive his right to a hearing before he was provided adequate notice of the charges.

■ Having decided that Dr. Downing's pre- and post-termination procedural due process rights were violated, we find that the district court should have granted his request for injunctive relief for reinstatement. We will address his claim for damages in Part III of the opinion. We now turn to his claims that his first amendment rights were violated.

## II

### First Amendment Claims

■ Initially, we note here too that we are not bound by the jury's findings that Dr. Downing was dismissed "with good cause." As in our earlier inquiry, the ultimate question of whether Dr. Downing was fired for reasons that impermissibly abridged his first amendment rights is a question of law for the trial court. *Cf. Dimick v. Schiedt,* 293 U.S. 478, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); *Williams v. Board of Regents of the University System of Georgia,* (5th Cir. 1980). In this inquiry, there are some factual matters which a jury could decide, for example, the extent of a disruption. But any questions of fact which a jury could decide which might relate to the ultimate

---

13. *See, e. g., Morrissey v. Brewer,* 408 U.S. 471, 485–86, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972).

14. *See Wolff v. McDonnell,* 418 U.S. 539, 571, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974) holding that a disciplinary committee of prison staff members was impartial enough to conduct disciplinary hearings. *See also Morrissey v. Brewer,* 408 U.S. 471, 486, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972): "The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them."

questions of law are nonetheless subject to careful review by the Court of Appeals which has the power to "conduct an independent review of constitutional claims when necessary." *Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974). This doctrine has been invoked in the obscenity context to override jury discretion as to what is "patently offensive," a finding which is part of the ultimate inquiry as to whether something is obscene.

As a secondary point, we note that the district court here did not set out the correct legal standards on this first amendment issue. *See* note 2. "Substantial disruption" is only one way of describing a small factor in a complex balancing test to deal with these issues that was set out by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). See note 15, *infra; Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979); *Williams v. Board of Regents of the University System of Georgia*, (5th Cir. 1980).

Dr. Downing argues that the administrative directives used as the basis for his dismissal were vague and overbroad in delimiting speech and that his specific statements on the medical records were protected by the first amendment. We will examine each of these arguments in turn.

The appellant says that the staff directives to "immediately cease editorializing through unusual and uncustomary statements in the clinical records . . . " and to "follow administrative channels to state your personal concerns . . . " were vague because they did not provide him with a reasonable opportunity to know what was prohibited, given the wide range of opinion about what is "editorializing," or what are "administrative channels." He urges that because of their vagueness, these rules had a "chilling effect" on speech. ▮ We disagree. Any regulation which proscribes certain conduct must be sufficiently definite to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden . . ."

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) quoting from *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). "A provision need not . . . be cast in terms that are mathematically precise; it need only give fair warning of the conduct proscribed, in light of common understandings and practices." *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir. 1980).

▮ In this case, we think these standards were met. The May 31 directives to Dr. Downing asked him essentially to cease "editorializing" in the clinical records, and to follow administrative channels to state his personal concerns "in lieu of editorializing in the clinical records." We think it is clear from these directives that what was proscribed was the writing of remarks that were irrelevant to a patient's clinical history. When Dr. Downing was told to cease editorializing, we think he had adequate and fair notice of what conduct was being forbidden.

▮ Dr. Downing also makes a claim that these directives were overbroad. Claims of overbreadth hinge on the fact that a regulation "does not aim specifically at evils within the allowable area of . . . control, but . . . sweeps within its ambit other activities that . . . constitute an exercise" of protected rights. *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). We understand Dr. Downing's argument to be that conduct or speech protected by the first amendment falls within the range of the activities prohibited by the directives. To determine whether that is true, we must first examine what speech or conduct this directive sought to regulate, whether that speech or conduct was a permissible area of regulation, and whether that speech or conduct was regulated in a constitutionally acceptable manner.

Dr. Downing argues that his statements in the hospital records were protected by the first amendment. He says that the social value of his speech in this context

was especially great because of the inability of the patients in this facility to assert their own rights. He urges that within the "penumbra" of values protected by the first amendment right of personal autonomy under *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) was his professional judgment as to what to write in a medical record.

The state of Texas argues in opposition that Dr. Downing's speech was not public speech and therefore not entitled to constitutional protection. The state says additionally that even if this Court finds the speech in this case was public speech, the comments were inappropriate for a patient's medical record chart.

■ As to the state's first argument concerning the "public" nature of the speech, we find that contention completely without merit. In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court said:

> The First Amendment forbids abridgement of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public. We decline to adopt such a view of the First Amendment.

*Id.* at 416, 99 S.Ct. at 696–697. We think this disposes of the appellee's contention that "private" speech is entitled to less constitutional protection than public speech.

■ However, we find that we are unable to examine the merits of Dr. Downing's first amendment claims further without returning the case to the trial court for more findings of fact concerning the preparation and use of patients' medical records.

In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court set out the standards under which a government could regulate the speech and conduct of its employees. That case held that the inquiry whether certain speech was protected entailed striking "a balance between the interests of the [employee] . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering* at 568, 88 S.Ct. at 1734–1735. In the later case of *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that to prove a constitutional violation, an employee must show that his activity was constitutionally protected, that the activity was a "substantial factor" in the decision to terminate the employee, and that the same decision would not have been reached, even in the absence of the protected activity. *Mt. Healthy City Board of Education* at 287, 97 S.Ct. at 576.

In this case, we must determine whether Dr. Downing's notations in the clinical records of patients were constitutionally protected. Such a determination cannot be made without a much more detailed examination of the purpose and use of these records at this facility. Certainly we can envision situations in which a hospital could legitimately restrict the comments of its medical personnel on patient records as a valid "time, place, and manner" restriction, see *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979), *Smith v. United States*, 502 F.2d 512 (5th Cir. 1974), or on the basis of some of the other factors listed as compelling in *Pickering*.[15] For example, in the interest of effi-

---

15. In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), some of the identified state concerns or interests which the Court said could be invoked against the fundamental interest in speech as part of a balancing test were:
1. The need to maintain work discipline and harmony;
2. The need for confidentiality;
3. The difficulty of countering false accusations;
4. The problem of statements that impede the employee's performance of his daily duties;
5. The problem of statements that are so without foundation that they question the employee's competence;
6. The fact that the position calls for a large amount of personal loyalty.

ciency or perhaps staff harmony, the hospital could require doctors to refrain from writing comments such as "Darth Vader for President," on the grounds that such a comment was inappropriate to a patient's record.

However here, it is impossible to decide whether Dr. Downing's comments were appropriate without further inquiry. Specifically, the trial court should look at the function and use of these records, in order to determine whether Dr. Downing's comments were peculiarly inappropriate for such a record. A key part of this inquiry should focus on patient accessibility to these records and whether there was another, equally effective, way for a doctor to communicate to patients the information that some medical personnel felt the patients were being mistreated. This is important here because we are not only dealing with Dr. Downing's first amendment rights of speech but with the patients' right to receive information that may be essential to their treatment. *Cf. Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806–1807, 23 L.Ed.2d 371 (1967) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. . . . *It is the right of the public to receive suitable access* to social, political, esthetic, moral and other ideas and experiences . . . ." (emphasis added)); *Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive . . . ."); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both;") *Porter v. Califano,* 592 F.2d 770, 773 (5th Cir. 1979); *see also* note 15. We see this issue of a "patient's right to know" about how other medical personnel view their treatment as especially important in this and other similar contexts, where patients, because of their handicap, may be incapable of finding out in other ways about possibly inadequate treatment. Patients in this hospital are wards of the state and the state cannot infringe upon this right to receive information.

The district court's inquiry should also focus, among other things, on how these records are kept, who has access to them, what the staff and supervisory personnel see as their purpose, and how such records are kept at other similar institutions and what rules are applicable to them there.[16] Only after such an inquiry, can any court begin to determine whether Dr. Downing's speech was protected under the standards established by *Pickering* and *Mt. Healthy City Board of Education.* For this reason, we remand Dr. Downing's first amendment claims to the trial court for consideration of these and related issues.[17]

In *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693 (1979), the Supreme Court reaffirmed the *Pickering* test, but added another factor to be balanced against the employee's first amendment rights, namely "the manner, time and place" in which the message was delivered. *Id.* at 415 n. 4, 99 S.Ct. at 696 n. 4.

In addition, it should be noted that in *Porter v. Califano,* 592 F.2d 770, 773 (5th Cir. 1979), this Court also spoke of the public's right to receive information as an element that had to be weighed in favor of the employee's speech activities.

**16.** Dr. Downing's claim that his professional judgment as to what to write in a medical record is protected under *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) can also be examined as part of this overall inquiry into the nature and purpose of hospital records.

**17.** Even were such an inquiry unnecessary, we might well have to remand this case to the trial court for a decision on the first amendment issue, pending the results of the new due process hearings which the hospital will have to hold, if it decides once again that it wishes to

## III

### Sovereign Immunity Claims

As stated previously, as part of its pretrial brief, the State of Texas argued that the Eleventh Amendment was a bar to a suit for damages against these defendants in their official capacities.[18] The trial court never addressed this contention, most likely because it did not find that the defendants had violated Dr. Downing's rights. In this Court, the State argues yet again, citing *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978), that the portion of the suit against the defendants in their official capacity is barred by the Eleventh Amendment. As the principal part of that argument, the State contends that the enactment of Article 6252–26, Texas Civil Statutes Annotated, which provides indemnification to state officers and employees for virtually all torts of those officers and employees, supports its position that these employees have Eleventh Amendment immunity.[19] Both because Downing argues in general terms that the statute is against public policy, and because this indemnification argument has been alluded to as an Eleventh Amendment defense even in cases where officers are sued in their individual capacity,[20] we will discuss briefly here the merits of an Eleventh Amendment defense for these defendants in both their official and individual capacities.

The Eleventh Amendment has been interpreted in a series of cases to restrict federal court jurisdiction in those cases in which the state is the real party in interest. *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890). This series of cases also holds that Eleventh Amendment immunity cannot be circumvented by suing a governmental unit or individual, which stands in the shoes of the state. *In re Ayers,* 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887); *Edelman v. Jordan,* 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1358, 39

terminate Dr. Downing. It would be difficult for us to make a determination that Dr. Downing's firing met the standards set by *Pickering* and *Mt. Healthy City Board of Education* without a specific valid determination of why Dr. Downing was terminated, a determination we found in Part I had not been made. Only with such a determination would it be possible to reach some sort of conclusion about whether Dr. Downing's "speech" was a substantial factor in the decision to terminate him, and whether that decision would have been reached, even if this "speech" had not occurred.

**18.** The Eleventh Amendment says:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or proscribed against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

**19.** That statute states:

Section 1. (a) The State of Texas is liable for and shall pay actual damages, court costs, and attorney fees adjudged against officers or employees of any agency, institution, or department of the state; against a former officer or employee of an agency, institution, or department of the state who was an officer or employee when the act or omission on which the damages are based occurred; or against the estate of such a person where the damages are based on an act or omission by the person in the course and scope of his office or employment for the institution, department, or agency and:

(1) the damages arise out of a cause of action for negligence, except a willful or wrongful act or an act of gross negligence; or

(2) the damages arise out of a cause of action for deprivation of a right, privilege, or immunity secured by the constitution or laws of this state or the United States, except when the court in its judgment or the jury in its verdict finds that the officer or employee acted in bad faith.

(b) This Act shall not be construed as a waiver of any defense, immunity or jurisdictional bar available to the state or its officers or employees. The state is not liable under this Act to the extent that damages are recoverable under a contract of insurance or under a plan of self-insurance authorized by statute. State liability under this Act is limited to $100,000 to a single person and $300,000 to a single occurrence, in the case of personal injury or death or the deprivation of a right, privilege, or immunity, and to $10,000 for a single occurrence of injury of or damage to property.

**20.** *See* Tribe, American Constitutional Law, 132–33 n. 22 (1978); *Hallmark Clinic v. North Carolina Dept. of Human Res.,* 380 F.Supp. 1153, 1159–60, n. 12, aff'd 519 F.2d 1315 (4th Cir. 1975); *cf. Edelman v. Jordan,* 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

L.Ed.2d 662.[21] In determining whether an action against a unit or individual is really against the state, a court must examine the relationships and duties created by state law as to the institution or individual involved to see whether Eleventh Amendment immunity exists. *Hander v. San Jacinto Junior College,* 519 F.2d 273 (5th Cir. 1975), *reh. den.* 522 F.2d 204. Therefore, here, it is necessary to determine whether the San Angelo Center is an instrumentality of the state of Texas for Eleventh Amendment purposes. By determining this, we thereby determine whether these individual defendants have an Eleventh Amendment immunity for a suit against them in their official capacities.

■ However, given the failure of the parties to present their views on this complex issue, involving construction of Texas law, we remand the issue to the district court for its determination of this part of the Eleventh Amendment question. *Cf. Walker v. Felmont Oil Corporation,* 240 F.2d 912, 916 (6th Cir. 1957).

■ However, as to the question of a damage suit against these defendants in their individual capacity, the Eleventh Amendment clearly provides no immunity, despite the State's indemnity statute. Such an indemnity statute is only an agreement

between the state and these individuals and cannot thereby be converted into an extension of Eleventh Amendment immunity by the state. *Cf. Gates v. Collier,* 489 F.2d 298, 302 (5th Cir. 1973). If we were to hold otherwise, by passing comprehensive indemnity statutes, states could set up sovereign immunity as a defense for almost all individuals sued for damages in their individual capacities under Section 1983.[22] The state, by passing such a statute does not become a party to the litigation. *Cf. Missouri, Kansas and Texas Railway Company v. Missouri Railroad and Warehouse Commissioners,* 183 U.S. 53, 22 S.Ct. 18, 46 L.Ed. 78 (1901). These individual defendants therefore have no Eleventh Amendment defense for a suit against them in their individual capacities.[23]

Having reached these determinations, we REVERSE and REMAND the case for proceedings not inconsistent with this opinion.

AINSWORTH, Circuit Judge, dissenting:

Judgment in favor of defendants was entered in this case under the order of the district judge pursuant to the special verdict rendered by the jury made in accordance with Rule 49 of the Federal Rules of Civil Procedure pertaining to "Special Verdicts and Interrogatories."[1] After a care-

---

**21.** We need not retrace here, the Eleventh Amendment exceptions which grew out of the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The holding in that case was based on the legal fiction that the suit was not against the state authority itself but the individual.

**22.** *See also* Tribe, American Constitutional Law, 132–33 n. 22: "Such voluntary assumption of an officer's liability ought to be insufficient to create eleventh amendment immunity. In the parallel case of intergovernmental tax immunities, assumption by the federal executive of state taxes levied against a private party is not enough to create tax immunity. . . . Alternatively, the state's voluntary extension of indemnification could be construed as a waiver of eleventh amendment immunity."

**23.** Normally, these individuals might be entitled to try to prove a good faith qualified immunity with a showing that they acted in good faith and without malice. *Wood v. Strickland,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); *Williams v. Board of Regents of the*

*University System of Georgia,* —— F.2d —— (5th Cir. 1980). However here, the defendants did not plead the qualified immunity defense, and therefore cannot avail themselves of it. *Gomez v. Toledo,* —— U.S. ——, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Bryan v. Jones,* 530 F.2d 1210, 1213 (5th Cir.) (en banc), *cert. denied* 429 U.S. 865, 97 S.Ct. 174, 50 L.Ed.2d 145 (1976).

**1.** Rule 49(a) pertinent to this case reads as follows:

**Rule 49.**
**SPECIAL VERDICTS AND INTERROGATORIES**

(a) **Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submit-

ful and thorough instruction to the jury pertaining to the questions submitted to it by the trial court, the jury's responses were all in favor of defendants and against plaintiff Dr. Downing. The jury held in its special findings that appellant Dr. Downing was dismissed from his employment by the defendants with good cause, that he was provided written notice of the reasons for his dismissal and an effective opportunity to respond to the charges before his superiors, that he waived his right to such notice and hearing, that the grievance procedure provided him with an effective opportunity in a hearing to respond before an impartial decision maker to the charges before him and that he waived his right as well to such an effective opportunity to respond in a hearing before an impartial decision maker. (See majority opinion notes 2–6). In a memorandum filed by the trial judge pursuant to the special verdict the court held that "[a]fter hearing and considering the evidence, the court finds the facts to be the same findings of fact found by the jury and

the court adopts such jury verdict and findings as the court's findings." The court's memorandum continued with additional reasons why Dr. Downing was properly discharged.[2]

Thus Dr. Downing lost his case before the court and jury fair and square. All of the findings were adverse to him and judgment was entered accordingly. Nevertheless the majority now holds by a somewhat nebulous distinction which it perceives between findings of fact and determinations of law that the jury's findings in response to the special interrogatories must be disregarded because they are "wrong as a matter of law." If this be true, trials under Rule 49 and especially those in which special verdicts are rendered by a jury, appear to have lost their efficacy. The majority ruling herein thus effectively bypasses the requirement of the seventh amendment that the court must accord due deference to the jury's verdict. *See Narcisse v. Illinois Central Gulf Railroad*, 620 F.2d 544, 546 (5th Cir.

ting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

2. The full text of the memorandum of Chief Judge Woodward follows:

MEMORANDUM

The above case was tried in San Angelo, Texas on the 22nd, 23rd, and 24th days of May, 1978 and a verdict was returned by the jury which is here referred to for all purposes. After hearing and considering the evidence, the court hereby finds the facts to be the same findings of fact found by the jury and the court adopts such jury verdict and findings as the court's findings.

Therefore judgment should be entered against the plaintiff as it appears that the plaintiff was dismissed from his employment by the defendants with good cause, that he was provided (prior to his dismissal) with written notice of the reasons for his dismissal and an

effective opportunity for a conference before his superiors to respond to the charges; and that the grievance procedure established by the plaintiff's employer provided the plaintiff with the effective opportunity of a hearing before an impartial decision maker to respond to the charges against him.

The court concludes that all the prerequisites of Constitutional due process were afforded to the plaintiff by the defendants. It further appears that the defendants did not abridge the plaintiff's right of free speech under the law and the facts as found by the jury.

Although the court is of the opinion that *there is sufficient evidence to support all of the* jury's findings of fact in this case, the plaintiff would not be entitled to a judgment even though the answers to Special Issues Numbers One, Two(a) and Two(c) were to be set aside. The jury specifically found in its answers to Special Issues Numbers Two(b) and Two(d) that the plaintiff had waived his rights to any notice, hearing or opportunity to respond, and such waivers are sufficient to form a basis for judgment in favor of the defendants.

*The Clerk will furnish a copy hereof to each attorney.*

ENTERED this 25th day of May A.D. 1978.

HALBERT O. WOODWARD
Chief Judge
Northern District of Texas

1980); *Spurlin v. General Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976).

"The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts." *Dimick v. Scheidt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935). Where the jury applies the law as instructed by the trial court and answers the special interrogatories propounded to it under Rule 49, the jury's findings must be upheld by the reviewing court if substantial evidence exists to support them. *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 767 (5th Cir. 1980); *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969).

Here it is clear that the jury's special findings on the facts are supported by substantial evidence in the record as to each finding. This court is therefore bound by the jury's verdict; to hold otherwise is to compel the parties to "forego [their] constitutional right to the verdict of a jury." *Dimick, supra*, 293 U.S. at 487, 55 S.Ct. at 301.

The majority however has disregarded the jury's special findings pertaining to the facts of Dr. Downing's dismissal and has reexamined the record itself to determine whether under the facts appellant was denied procedural due process by his termination. This is not a proper function of a reviewing appellate court. The conclusion which the majority reaches that the case must be remanded for a new trial is not only opposite to the jury's special findings, but is contradicted by the evidence. Under the majority holding therefore Dr. Downing will get another chance to try, if he can, before another jury at another time, to convince the jury that he was wrongly discharged.

### The Due Process Issue

On numerous occasions throughout his tenure as a staff psychiatrist at the San Angelo State Center, Dr. Downing caused disruptions among staff members by writing comments in patients' medical records that reflected his opinion of various staff members, hospital programs and state and federal agencies. Dr. Downing's comments and his resultant problems with the staff were in most cases brought to the attention of Mr. R. Allen Williams, Superintendent of the San Angelo State Center, through the supervisor of the dormitory personnel or the unit director or through the assistant superintendent. These matters were discussed with Dr. Downing in October 1976 at a meeting at which Dr. White, the medical director, Mr. Willis, the personnel officer, Mr. Williams and appellant were present. The meeting lasted several hours and all parties had an opportunity to voice their views. Dr. Downing was informed by Mr. Williams that his practice of writing editorial comments on patients' charts prevented the staff from providing the best service for their patients, that he must refrain from this conduct and instead bring his grievances to Mr. Williams' attention. Then on May 31, 1977, after having received reports of other similar incidents of inappropriate commenting by Dr. Downing in clients' medical records, Mr. Williams had another conference with appellant to discuss his conduct. At this meeting Mr. Williams handed Dr. Downing a letter of that date and discussed at length its contents with him. The letter advised Dr. Downing of Mr. Williams' concerns regarding appellant's difficulties with the staff and the problems he was creating among staff members through his use of written comments in patients' records. The letter emphasized that these problems had continued for several years, even during prior administrations, and thus Dr. Downing must follow two directives in order to continue his employment at the San Angelo State Center. The directives ordered appellant to "immediately cease editorializing through unusual and uncustomary statements in the clinical records of the clients of this facility," and to "follow administrative channels to state your personal concerns regarding staff and programs in lieu of editorializing in the clinical records." The letter also stated that if Dr. Downing did not comply with these directives his employment could be terminated.

Dr. Downing failed to heed the directives, and on June 20, 1977, Mr. Williams again held a conference with Dr. Downing at which Dr. White and Mr. Willis also were present. At this time Mr. Williams showed appellant a comment written by Dr. Downing on a patient's chart which violated the directives in the May 31 letter.[3] Mr. Williams read appellant the letter and gave Dr. Downing an opportunity to discuss the comment and explain his conduct, but he declined to respond. Upon Dr. Downing's continued refusal to answer the charges against him, Mr. Williams delivered a letter to appellant which informed him of his discharge, also explained to him that his conduct violated the May 31 directives, and that Mr. Williams had no recourse other than to discharge him because of deliberate insubordination. Mr. Williams then sent appellant a copy of the Rules of the Commissioner of the Texas Department of Mental Health and Mental Retardation regarding appellant's right to obtain a hearing before an impartial grievance committee established by the Department concerning the administration's decision to terminate him.[4] Dr. Downing did not seek redress at the agency level following his termination, but instead filed this suit in federal district court.

Since Dr. Downing was a nonprobationary government employee, he could only be dismissed for cause in accordance with the Rules of the Commissioner of the Texas Department of Mental Health and Mental Retardation, and thus had a constitutionally protectable property interest in his expectation of continued employment. *Perry v. Sinderman*, 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972); *Thurston v. Dekle*, 531 F.2d 1264, 1272 (5th Cir. 1976), *vacated and remanded on other grounds*, 438 U.S. 701, 98 S.Ct. 3118, 57

L.Ed.2d 1144 (1978) (original opinion reinstated with substitutions, 578 F.2d 1167 (5th Cir. 1978)). Accordingly, Dr. Downing cannot be deprived of this property interest without due process. *Perry, supra*, 408 U.S. at 603, 92 S.Ct. at 2700; *Board of Regents v. Roth*, 408 U.S. 564, 564, 92 S.Ct. 2701, 2703, 33 L.Ed.2d 548 (1972). Procedural due process, however, does not require that a person possessing a property interest in his employment be accorded a full evidentiary hearing prior to his termination. *See Arnett v. Kennedy*, 416 U.S. 134, 135, 94 S.Ct. 1633, 1635, 40 L.Ed.2d 15 (1974); *Davis v. Vandiver*, 494 F.2d 830, 831 (5th Cir. 1974). Rather, in determining what procedures are necessary to protect against the wrongful termination of an employee, "a balance must be struck between the government's and the employee's respective interests." *Thurston, supra*, 531 F.2d at 1272. Since the "government interest in efficient . . . operation is a weighty one," *id.* at 1272, the balance should operate to minimize the risk of wrongful termination to an employee "without burdening the government with elaborate pretermination proceedings." *Id.* at 1273; *Glenn v. Newman*, 614 F.2d 467, 472 (5th Cir. 1980). The district court correctly instructed the jury that in order to meet the minimal procedural requirements of due process prior to termination the employee must be given written notice of the reasons for termination and an effective opportunity to respond orally and in writing to the charges. *Glenn, supra*, 614 F.2d at 472; *Thurston, supra*, 531 F.2d at 1273.

Here, the jury's findings in its answers to special interrogatories that appellant Dr. Downing was accorded these procedural prerequisites is substantially supported by the record. Dr. Downing was given written notice of the reason for his discharge by Mr.

---

3. In direct contravention of the Center's directives to cease editorializing and entering unusual and uncustomary statements in patients' records, Dr. Downing wrote on a patient's chart, among other things, that the patient had died as a result of "Gross neglect." It was specifically on the basis of this comment that Dr. Downing ultimately was discharged.

4. The record indicates that Dr. Downing was aware of the available grievance procedure for some time prior to his termination. He thus had the opportunity at all times to seek resolution of any grievance he may have had against the San Angelo State Center and its staff. He did not take advantage of these procedures and consistently refused to use the proper administrative channels in voicing his grievances.

Williams' June 20 letter in which his employment was actually terminated. This letter made reference to the directives contained in Mr. Williams' May 31 letter to Dr. Downing which set out specifically the proscribed conduct and informed appellant that engaging in such conduct could lead to his dismissal. As early as the October 1976 meeting Dr. Downing was aware that if he did not cease editorializing and making inappropriate comments in patients' records, he could be discharged. Throughout this time he had ample opportunity to respond to the administration's directives informally by a conference before his superiors through the agency's grievance procedure. He never sought resolution of his grievances through the available procedures. At the June 20 meeting, prior to being given his termination letter and after he was told of the charges against him, Dr. Downing again was provided an opportunity to reply to those charges. He refused to comment.

After his termination appellant was officially notified of the agency procedure whereby he could challenge the administration's actions before an impartial panel established for the purpose of hearing his complaints. Dr. Downing failed to invoke this procedure. The majority's determination that this failure could not operate as a waiver of appellant's right to a hearing because "he did not know exactly why he was fired" is contradicted by the evidence. Although the majority concludes that Dr. Downing was not provided an adequate statement of the charges against him, it nevertheless points out that the staff directives included in the May 31 letter to him were sufficiently definite to "'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), *quoting United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). Clearly a "person of ordinary intelligence" would know that the comment "Gross neglect," which Dr. Downing wrote on a patient's chart and which finally resulted in his discharge, violated those directives. This is particularly true in

Dr. Downing's case since he repeatedly had been warned against engaging in such conduct. This is what the jury found in their answers to special interrogatories and their findings are amply supported by the record. Thus, Dr. Downing was accorded all that was necessary to guarantee him fair notice and an effective opportunity to respond both orally and in writing to the matters surrounding his termination. His failure to take advantage of the procedures made available to him clearly operates as a waiver of any future right to a hearing. The majority's conclusion to the contrary is therefore erroneous.

### The First Amendment Issue

In addressing the first amendment issue presented by appellant in this appeal, the majority again disregards the jury's special interrogatory finding that Dr. Downing was dismissed "with good cause," and instead conducts an independent review of the record to determine whether appellant's first amendment freedoms have been abridged by the actions of the administrators of the San Angelo State Center. Holding that the record is inadequate regarding the preparation and use of patients' records at the center, the majority returns the case to the district court apparently for further findings and further explanatory evidence regarding Dr. Downing's first amendment claims. Upon careful review of the evidence, however, the record is clear that there is substantial support for the jury's finding that the actions taken against Dr. Downing did not unreasonably infringe on his first amendment freedoms and that he was not fired for an impermissible cause. Thus, further hearing is unnecessary on this issue. (See Dr. Sears, Dr. White, R., II, 29, 31–32, 35; R., III, 198; R.N. Knight, R.N. Godwin, R., IV, 253–256).

In *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), the Supreme Court pointed out that the problem in any case where there is a need to regulate the speech of public employees is "to arrive at a balance between the interests of the [employ-

ee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." In striking this balance, the *Pickering* decision drew a distinction on the one hand between speech which does not affect working relationships among employees and on the other hand statements, such as those involved here, which are directed toward persons with whom the speaker would normally be in contact in the course of his daily work. Thus there results a question of maintaining discipline or harmony among coworkers. See *Pickering, supra,* 391 U.S. at 569–70, 88 S.Ct. at 1734. In determining that comments on matters of public concern that are substantially correct may not furnish grounds for dismissal merely because they are critical in tone, the Court noted that "significantly different considerations" would be involved in cases where "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Pickering, supra,* 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. The same can be said for positions in public employment which involve close working relationships among other coworkers. The need for confidentiality may be so great that "even completely correct public statements might furnish a permissible ground for dismissal." *Id.* See *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415, 99 S.Ct. 693, 696 n. 3, 58 L.Ed.2d 619 (1979).

The Court also noted that a different case is presented where employees are provided grievance procedures to submit complaints about the operation of the facility to their superiors prior to bringing complaints before the public. See *id.* 391 U.S. at 572 n. 4, 88 S.Ct. at 1373 n. 4.[5] And later, in *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977), while again addressing the question of whether speech of a government employee was constitutionally protected, the Supreme Court indicated that speech which violated an established policy would be treated differently from "ad hoc" communications which were entitled to first amendment protection.

All of the above circumstances are present in this case and thus mandate striking the balance in favor of the state. Dr. Downing's practice of entering uncustomary comments in patients' records not only violated the written and stated directives of the San Angelo State Center administration to refrain from editorializing and entering inappropriate statements on patients' medical charts,[6] but was the cause of repeated disruptions among Dr. Downing's coworkers. The principal targets of appellant's comments were other staff members at the facility. The effect of these statements upon the staff's attitude and working relationships and the fact that the continued editorializing substantially interfered with the efficient functioning and operation of the Center were the chief concerns of Mr. Williams and other members of the Center's administration and the reason why appellant Dr. Downing finally was discharged. It was not the fact of the criticism or the nature of the statements, but rather the manner in which Dr. Downing chose to voice his grievances, despite the options available to him to make his complaints heard before the appropriate author-

---

5. See also *Pickering v. Board of Education,* 391 U.S. 563, 582 n. 1, 88 S.Ct. 1731, 1742 n. 1, 20 L.Ed.2d 811 (1968) (White, J., concurring in part and dissenting in part) ("[T]he Court's opinion . . . does not foreclose the possibility that under the First Amendment a school system may have an enforceable rule . . . that public statements about school business must first be submitted to the authorities to check for accuracy.")

6. As was noted earlier, the majority found that the staff directives to appellant to "immediately cease editorializing through unusual and uncustomary statements in the clinical records" and "to follow administrative channels" to state his personal concerns were not vague and gave Dr. Downing fair warning of the conduct proscribed. See *Stansberry v. Holmes,* 613 F.2d 1285, 1289 (5th Cir. 1980).

ities informally and through the established grievance procedure.

Under these circumstances, the jury correctly found that Dr. Downing was dismissed for good cause. The action taken by the administrators of the San Angelo State Center in terminating Dr. Downing's employment after repeated warnings to refrain from the disruptive conduct which led to his discharge was reasonable considering "the State's paramount interest as an employer in promoting the efficiency of the public services it performs through its employees" and appellant's bad faith in persisting in engaging in conduct it knew to be disruptive. *Rosado v. Santiago*, 562 F.2d 114, 117 (1st Cir. 1977).

I cannot therefore agree with the conclusions reached by the majority. I would affirm the judgment entered in the district court.