Amy SCHAEFER, Margaret Hill, and
Diane Dominguez, Plaintiffs,

v.

Ernest B. WILCOCK, et al.,
Defendants.

Civ. Nos. 87–C–0111G, 87–C–0226G
and 87–C–0512S.

United States District Court,
D. Utah, C.D.

Dec. 29, 1987.

Kathryn Collard, Salt Lake City, Utah, for plaintiffs.

Stephen J. Sorenson, Robert R. Wallace, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on motions to dismiss and for summary judgment which were argued extensively on November 9, 1987, and taken under advisement. Kathryn Collard represented the plaintiffs, Stephen J. Sorenson represented defendant officials of the Utah Highway Patrol and Robert R. Wallace represented defendant Eric Nielsen.

In these actions, which were consolidated for purposes of pretrial discovery,[1] each plaintiff claims that she was sexually assaulted by Ernest B. Wilcock ("Wilcock") who at relevant times was employed as a Trooper of the Utah State Highway Patrol ("UHP"). UHP hired Wilcock as a Trooper in 1984. The incidents occurred during the last week of October 1986 and on or about January 1, 1987 in the case of plaintiff Hill,[2] on February 8, 1987 in the case of plaintiff Dominguez,[3] and also on February 8, 1987 in the case of plaintiff Schaefer.[4]

Plaintiffs maintain this action against Wilcock,[5] seventeen other defendants, who are officers and employees of UHP,[6] and Dr. Eric Nielsen who performed a psychological assessment on Wilcock.

Plaintiffs have filed this action under 42 U.S.C. § 1983 alleging past and continuing violations of their rights under the first, fourth, ninth, and fourteenth amendments to the United States Constitution and under state law. Plaintiffs allege that Wilcock's actions constituted a violation of the following federal rights: (1) freedom from the use of excessive and unreasonable force during arrest; (2) freedom from the deprivation of liberty without due process of law; (3) freedom from summary punishment; (4) freedom from invasion of priva-

---

1. This court consolidated three separately filed cases for purposes of discovery and consideration of all pretrial motions on August 17, 1987.

2. Hill claims that during the last week of October Wilcock induced her to enter his patrol car, tried to coerce her into performing sexual acts with him by threatening her with arrest, handcuffed her hands and legs, and then raped her. Afterward, Hill claims that Wilcock repeatedly called her on the telephone and that he came to her home. When she rebuffed these advances he threatened to arrest her and take away her children. Hill also claims that on or about January 1, 1987, Wilcock ordered her into his patrol car, drove to an isolated location, raped her, and threatened her with arrest if she told anyone.

3. Dominguez claims that Wilcock unjustifiably handcuffed her while she was performing a field sobriety test, that he announced he had to frisk her before taking her in, fondled her crotch and breasts, and that he detained her in his patrol car for over an hour while intimating that he would arrest her unless she did "something" for him.

4. Schaefer claims that Wilcock induced her to enter his Patrol vehicle at night by offering to escort her home. She claims he then took her to an isolated location, and tried to coerce her into performing sexual acts with him by threatening her with arrest, and that he fired shots from his pistol at her as she escaped from the scene in his vehicle.

5. Plaintiffs assert claims for relief against Wilcock on various theories in which it is asserted that he intentionally and maliciously violated various rights. Defendant Wilcock has filed a petition in bankruptcy and the actions are stayed as against him.

6. The individual UHP defendants are John T. Nielsen (Utah's Commissioner of Public Safety), Nordfelt (the superintendent of the Utah Highway Patrol at the time in issue), and defendants Hunt, Ormand, Taylor, Cartwright, Slagowski, Steen, Wendel, Gunrud, Orr, Nielsen, Richins, Chabries, Larson, Knight, and Snodgrass (all officers or employees of the Utah Highway Patrol).

cy; and (5) freedom of access to the courts for the redress of injuries. Plaintiffs also claim they were falsely arrested, subjected to unreasonable search and seizure, and discriminated against on the basis of gender.

Plaintiffs allege that the UHP officials were grossly negligent or deliberately indifferent in qualifying, hiring, training, supervising, and retaining Wilcock as an officer of the UHP, and were grossly negligent in adopting and executing official policies and procedures because the policies and procedures were grossly inadequate to protect plaintiffs' civil rights. In this regard, plaintiffs specifically allege that the defendants were grossly negligent in one or more of the following actions: (1) in relying on a pre-employment background check that was inadequate in a number of respects, including the comprehensiveness of medical information gathered, the number of people interviewed, their appropriate-ness for interview, and the extent of the interviews; (2) in ignoring expressed reservations against Wilcock found in the UHP background check, including findings of UHP captains after interviewing Wilcock, Wilcock's lack of proper personal and psychological qualities, and recommendations against his being hired; (3) in giving no regard to Wilcock's difficulty in graduating from the police academy; (4) in not requiring periodic reevaluations despite knowledge that the psychological evaluations done on all officers before employment are valid only for 12–18 months; (5) in retaining Wilcock, despite knowledge of deficiencies in good judgment and interpersonal skills; and, (6) in their investigation of complaints of improper conduct made against Wilcock in connection with stops for alleged traffic offenses beginning about six months before the reporting of the incidents here.[7]

---

**7.** Plaintiffs have provided evidence by affidavit showing that at least three women had complained of improper conduct by a UHP trooper prior to the incidents which form the basis of this complaint. Plaintiff has also provided evidence, by way of affidavit, tending to show that at least some of these women identified Wilcock as the offending officer.

Wilcock's alleged attacks on plaintiffs Schaefer, Hill and Dominguez were reported on or about February 8, 1987. Five other women—Appia Khan, Nancy Maddocks, Jane Anglin, Kay Dawn McCoy and Terri Foltz—had reported similar improper conduct of an unknown officer or Wilcock as early as August 26, 1986. Appia Khan filed a complaint with the police against Wilcock on August 26, 1986. She complained that he had stopped her for an alleged safety inspection violation, made her sit in his car while he questioned her about unrelated personal matters, and told her he would give her a ticket unless she agreed to meet him on a certain night to "drive around" and discuss the matter. Other officers later observed Wilcock's patrol car approach the meeting place several times, then drive away. Wilcock initially denied stopping Khan, but later admitted it, although he had not radioed in the stop nor logged it, as required by official procedures. He also denied ever threatening her with prosecution if she declined to meet him.

Nancy Maddocks complained to UHP over the telephone about Wilcock on August 26, 1986. She complained that Wilcock had stopped her for speeding and insisted that she had been travelling at sixty-five miles per hour. Maddock complained because she thought Wilcock was lying and abusing his power.

On December 6, 1986, Jane Anglin reported to West Valley police that she had been pulled over by an officer for allegedly driving under the influence of alcohol. The officer detained her in his car for over an hour, questioned her about personal and sexual matters, and intimated that he wanted to have sexual relations with her in order to clear up the matter. When she refused, he subjected her to a search in which he fondled her breasts and crotch, then let her go. She made a composite drawing of the officer, but the police never showed her any pictures of UHP officers. It is unclear which police force was involved in the composite drawing and the investigation. On December 10, 1986, an article in a local newspaper described the incident.

Kay Dawn McCoy read the newspaper article on December 10, 1986, and filed a complaint with the Salt Lake County Sheriff's Department. She claimed a UHP officer had stopped her for an alleged driving-under-the-influence violation, made her sit in his car for over an hour, questioned her about personal matters and her sex life, and then asked if she would like to have sex with him. When she refused, telling him she was pregnant, he let her go. McCoy inquired at the Sheriff's department whether she could see pictures of UHP officers and Anglin's composite drawing. She was told that her assailant could not have been a UHP officer and that it wouldn't do any good to look at the pictures.

Terri Foltz's husband complained by telephone to UHP on December 18, 1986, that a UHP officer had stopped his wife and subjected her to a search in which he reached under her blouse and fondled her breast.

With respect to Eric Nielsen's motion for summary judgment, the court notes that Plaintiffs included Eric Nielsen as a defendant because he performed the initial psychological assessment on Wilcock. Utah law requires that before admission to a peace officer training academy, every applicant must be "free of any physical, emotional or mental conditions which might adversely affect the performance of duty as a peace officer as determined through a selection process." Utah Code Ann. § 67–15–6 (1986). Defendant Eric Nielsen, a licensed clinical social worker,[8] entered into a contract with UHP to perform such preemployment psychological assessments of candidates for jobs with UHP.[9] He performed such an assessment of Wilcock and transmitted the results to UHP on or about June 21, 1984, at which time he also recommended employment of Wilcock. Plaintiffs claim that Nielsen is liable for violations of the same civil rights as the UHP officials because of his involvement with the qualification and hiring of Wilcock, and also claim a state law cause of action for Nielsen's alleged negligence in performing his official duties.

## ·ANALYSIS

### I. MOTION TO DISMISS—UHP AND UHP OFFICIALS

In this case the plaintiffs originally sought an award of damages as well as declaratory and prospective injunctive relief against the UHP, and the named UHP officials in their official and personal capacities. The UHP and UHP officials have moved to dismiss the complaint in its entirety for various reasons.

### A. ELEVENTH AMENDMENT IMMUNITY

■ Defendants first contend that the Eleventh Amendment entirely bars plaintiffs' complaint. In general, the rules governing application of the Eleventh Amendment are difficult to fit into "any coherent framework." *Papasan v. Allain,* 478 U.S. 265, ——, 106 S.Ct. 2932, 2948, 92 L.Ed.2d 209 (1986) (Brennan, J., concurring and dissenting). Nevertheless, it is abundantly clear that " 'in the absence of consent a suit in which the State or one of its agencies or departments is named as a defendant is proscribed by the Eleventh Amendment.' " *Id.* at 2939 (quoting *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam); *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985); *Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979). This proscription applies although the plaintiff is a citizen of the state sued, *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and "whether the relief sought is legal or equitable." *Papasan,* 106 S.Ct. at 2939. However, the immunity of the Eleventh Amendment does not extend to suits against counties, municipal corporations, or other of a state's political subdivisions. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (citing *Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890) and *Moor v. County of Alameda,* 411 U.S. 693, 717–21, 93 S.Ct. 1785, 1799–01, 36 L.Ed.2d 596 (1973)). Application of the Eleventh

---

Prior to February 1987, all complaints regarding police officer misconduct were circulated to all Utah police agencies. Also, complaints of police officer misconduct are reviewed at monthly meetings of all Utah police agency officers.

**8.** Eric Nielsen is licensed as a clinical social worker under Utah Code Ann. § 58–35–2(5) (1986) which defines the "[p]ractice of clinical social work" as "the application of an established body of knowledge and professional skills in the practice of psychotherapy including assessment and treatment ... related to functioning, developing, and total well being, including mental health and mental illness." Affidavit of Eric Nielsen, at 2.

**9.** By affidavit in support of his motion for summary judgment, Nielsen asserts that he performed psychological assessments under a contract with UHP in which he was denominated as an independent contractor and was paid on a case-by-case basis with no obligation beyond submission of the assessment reports. Affidavit of Eric Nielsen, at 3–4.

Amendment's rules of prohibition is difficult in a case such as this because of the nature and capacities in which the various defendants acted, the various kinds of relief sought, and the wide-ranging bases upon which relief is asserted. The Court will analyze the effect of the Eleventh Amendment with respect to the UHP, the UHP officials in their official capacities, and the UHP officials in their personal capacities.

### 1. *The Utah Highway Patrol*

■ Plaintiffs in their Memorandum in Opposition concede that the Eleventh Amendment bars their suit insofar as it seeks relief from the UHP.[10] The court notes that application of the principles stated above renders the UHP itself immune from any suit in federal court, whether based on § 1983 or on breach of any state law obligation, *Pennhurst*, 465 U.S. at 106, 104 S.Ct. at 911, and whether the relief sought is legal or equitable. *Papasan*, 106 S.Ct. at 2939. Accordingly, the UHP is dismissed for lack of jurisdiction.

### 2. *UHP Officials in Their Official Capacities*

■ Plaintiffs also seek damages and equitable relief from certain UHP officials as officials. The Supreme Court has made clear that "official capacity" suits are in fact suits against the government entity. In *Kentucky v. Graham*, the Court stated the following:

> Official-capacity suits ... "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon* [*v. Holt*], 469 U.S. [464] at 472–73, 105 S.Ct. [873] at 878 [83 L.Ed.2d 878]. It is not a suit against the official personally for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Thus, where state[11] officials are sued in their official capacity, the state's Eleventh Amendment immunity attaches and federal courts are without jurisdiction. *See Edelman v. Jordan*, 415 U.S. 651, 672–73, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 462–64, 65 S.Ct. 347, 349–50, 89 L.Ed. 389 (1945).

■ In 1908 the Supreme Court recognized one limited exception to this rule of immunity, holding that a suit challenging the constitutionality of a state official's conduct was not a suit against the state and thus was not prohibited by the Eleventh Amendment. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[12]

---

**10.** Plaintiffs' memorandum states,
Based upon [plaintiffs' determination that full injunctive relief may be obtained against the defendant individuals] and to avoid any issue on appeal regarding any Eleventh Amendment immunity of the defendant UHP, as an agency, from plaintiffs' claims, plaintiffs Schaefer, Hill and Dominguez will not pursue their claims for injunctive relief against the defendant UHP, as an agency, and will not further contest the defendant UHP's motion for dismissal as a defendant in plaintiffs' consolidated cases.
The UHP is plainly an agency of the State of Utah under Utah Code Ann. §§ 27-10-1 *et seq.* and 41-13-4(1) *et seq.* The UHP is under the supervision and control of the State Commis-

sion of Public Safety which is charged with enforcing state law on all highways of the state.

**11.** Since no Eleventh Amendment immunity attaches to municipal governments there is no need to plead suits against local government officials. However, prior to *Monell*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) suits were brought against local government officials because local governments were not considered "persons" suable under § 1983 according to *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–92, 5 L.Ed.2d 492 (1961).

**12.** The court accomplished this result on the theory that an unconstitutional act was necessarily void and therefore actions purportedly

The Supreme Court has not expansively interpreted this case, rather in *Edelman v. Jordan,* the Court reaffirmed that the Eleventh Amendment bars awards of damages against officials acting in their official capacities, and held that the amendment also bars equitable relief that is not by its terms prospective in nature and that does not have only an ancillary effect on the state treasury. 415 U.S. at 663, 667–68, 94 S.Ct. at 1357–58 (1974).[13] Similarly, in *Green v. Mansour,* the Supreme Court held that the Eleventh Amendment also bars an award of a declaratory judgment in circumstances where it "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief of course prohibited by the Eleventh Amendment." 474 U.S. at 73, 106 S.Ct. at 428 (1985). That is, "a declaratory judgment is not available when the result would be a partial 'end run' around [the court's] decision in *Edelman v. Jordan.*" *Id.*

More recently the court has announced that the *Ex Parte Young* exception does not obtain where a federal constitutional claim is not the basis upon which relief is sought. In *Pennhurst State School & Hospital v. Halderman,* the Court noted that its decisions in *Ex Parte Young* and *Edelman* represented an effort to " 'harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution.' " 465 U.S. 89, 105, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984) (quoting *Perez v. Ledesma,* 401 U.S. 82, 106, 91 S.Ct. 674, 687, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part)). The exception *Ex Parte Young* carves out "rests on the need to promote the vindication of federal rights." *Id.* Where a plaintiff seeks relief against a state official in federal court, not based on an infringement of any federal right, the federal interest in assuming jurisdiction is minimal and the "need to reconcile competing interests is wholly absent." *Id.* at 106,

authorized by the unconstitutional act were not taken in an official capacity:

> If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ex parte Young,* 209 U.S. at 159–60, 28 S.Ct. at 454. This rationale created the "well-recognized irony" that "unconstitutional conduct by a state officer may be 'state action' for purposes of the Fourteenth Amendment yet not attributable to the State for purposes of the Eleventh." *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 3315, 73 L.Ed. 2d 1057 (1982) (opinion of Stevens, J.).

**13.** In *Papasan v. Allain,* the Supreme Court explained the distinction between permissible and impermissible relief under *Ex Parte Young,* as follows:

> Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant. This is true if the relief is expressly denominated as damages. *See, e.g., Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S.

459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else. *See, e.g., Green v. Mansour, supra* 474 U.S., at 69, 106 S.Ct., at 426; *Edelman v. Jordan,* 415 U.S. 651, 664–668, 94 S.Ct. 1347, 1356–1358, 39 L.Ed.2d 662 (1974). On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury. *See Milliken v. Bradley,* 433 U.S. 267, 289–290, 97 S.Ct. 2749, 2761–2762, 53 L.Ed.2d 745 (1977); *Edelman,* 415 U.S., at 667–668, 94 S.Ct. at 1357–1358.

For Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct: "[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman, supra,* [415 U.S.] at 667, 94 S.Ct. at 1357. Compare, *e.g., Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), with *Green v. Mansour, supra.* In discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought, *see, e.g., Edelman, supra* 415 U.S. at 668, 94 S.Ct., at 1358, and will be guided by the policies underlying the decision in *Ex parte Young.*

106 S.Ct. at 2940–41.

91 S.Ct. at 687. In such cases the exception of *Ex Parte Young* and *Edelman* is inapplicable since,

> [a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.

*Id.*

In this case plaintiffs seek damages, a declaratory judgment, and injunctive relief against the UHP officials for their alleged violation of plaintiffs' constitutional and state law rights. The court concludes that application of the principles stated above requires dismissal of any claim for damages against the UHP officials acting in their official capacities, as well as all state law claims, whether in law or in equity, against the officials as such. The declaratory relief sought in this case is also barred, since it would function much the same as an award of damages, and is not sought to "directly bring an end to a present violation of federal law." *Papasan*, 106 S.Ct. at 2941. The only claim against the UHP officials in their official capacities that withstands the jurisdictional bar of the Eleventh Amendment is plaintiffs' claim for prospective injunctive relief under § 1983. Accordingly, all other official capacity claims are dismissed for lack of jurisdiction under the Eleventh Amendment.

### 3. *UHP Officials in Their Personal Capacities*

▉ Finally, plaintiffs seek to impose liability on the named UHP defendants in their "individual" or "personal" capacities. Unlike official-capacity suits, "personal-capacity suits seek to impose personal liabili-

ty upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). An award of damages in a personal capacity suit, "can be executed only against the official's personal assets," whereas in an official capacity suit the plaintiff "must look to the government entity itself." *Id.* at 166, 105 S.Ct. at 3105. Since personal-capacity suits do not extend any form of liability to the State, the Eleventh Amendment is not implicated, though the named defendant holds public office, and though he acted under color of state law. *Papasan*, 106 S.Ct. 2940, n. 11; *Scheuer v. Rhodes*, 416 U.S. 232, 237–39, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974). Thus, there is no jurisdictional bar to a personal capacity suit in federal court under § 1983. Similarly, the Eleventh Amendment does not affect suits in federal courts against individuals based on an alleged breach of some state-law-based duty.[14]

In this case, however, the defendants argue that even plaintiffs' claims against the defendants personally must be dismissed. In their reply brief defendants argue that plaintiffs' personal-capacity claims must be dismissed because of the enactment of Utah Code Ann. §§ 63–30–36(1) and –36(5) (Supp.1987). These statutes provide as follows:

> (1) Except as [otherwise] provided ... a governmental entity shall defend any action brought against its employee arising from an act or omission occurring:
>
> (a) during the performance of the employee's duties;
>
> (b) within the scope of the employees' employment; or
>
> (c) under color of authority
>
> ....
>
> (5) If a governmental entity conducts the defense of an employee, the governmental entity shall pay any judgment based

---

**14.** The court's conclusion, of course, assumes that federal court jurisdictional requirements are otherwise met. "[W]hen a federal court obtains jurisdiction over a federal claim, it may adjudicate other related claims over which the court would not otherwise have jurisdiction." *Pennhurst*, 465 U.S. at 117, 104 S.Ct. at 917

(citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). In this case plaintiffs do not allege an independent jurisdictional basis for their state law claims. Rather, these claims are asserted as pendent to plaintiffs' § 1983 claim.

upon the claim, or any compromise or settlement of the claim, except as provided in Subsection (6).

The defendants argue that these statutes operate to obligate the state to pay judgments in this case rendered against the UHP officials as individuals. Since the judgment will in fact be paid from the state treasury, the argument proceeds, "the Eleventh Amendment immunity which the State enjoys must extend also to [the defendants] individually." Reply of Defendants Utah Highway Patrol Officials, at 15.

 The court does not agree. The scope of Eleventh Amendment immunity is a question of federal law. *Miller–Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d 323, 330 (7th Cir.1977). In determining whether a suit is in fact one against the state, federal courts have developed various tests, including determining against whom a judgment will operate. Here, defendants would have the court conclude that plaintiffs' suit is against the state because any judgment rendered will be paid out of the state treasury. This test, however, is one of strict necessity. Only if the judgment *must* be paid out of state funds will Eleventh Amendment immunity attach. *Id.* at 327–28; *Jackson v. Hayakawa,* 682 F.2d 1344 (9th Cir.1982); *Meiner v. Missouri,* 673 F.2d 969 (8th Cir. 1982); *Travelers Indemnity Co. v. School Board,* 666 F.2d 505 (11th Cir.1982); *Karpovs v. Mississippi,* 663 F.2d 640 (5th Cir. 1981); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345 (9th Cir.1981). In this case judgments rendered against individuals will be paid out of the state treasury not because relief is necessarily directed at the state, but rather because of the state's voluntary, unilateral decision to assume responsibility. As the court noted in *Duck-*

15. *Hallmark Clinic v. North Carolina Dep't of Human Resources,* 380 F.Supp. 1153, 1159–60, 1160 n. 12 (E.D.N.C.1974), *aff'd,* 519 F.2d 1315 (4th Cir.1975) has suggested otherwise. Professor Tribe has persuasively criticized this decision:

> Such a voluntary assumption ·of an officer's liability ought to be insufficient to create eleventh amendment immunity. In the parallel case of intergovernmental tax immunities, assumption by the federal executive of state

*worth v. Franzen,* 780 F.2d 645, 650–51 (7th Cir.1985),

> [t]he purpose of the Eleventh Amendment is only to protect the state against involuntary liability. If the state chooses to pick up the tab for its errant officers, its liability for their torts is voluntary. It is true that the burden of tort judgments against state employees may eventually come to rest on the state with or without indemnity. If the state doesn't indemnify its officers it may have to pay them higher salaries so that they can buy insurance that will do so. But this type of argument has never succeeded in getting the bar of the Eleventh Amendment extended to suits against state officers in their individual capacities, and anyway is unrelated to the indemnity statute. Moreover, it would be absurd if all a state had to do to put its employees beyond the reach of section 1983 and thereby make the statute ineffectual except against employees of local governments was to promise to indemnify state employees for any damages awarded in such a suit.

*See also Downing v. Williams,* 624 F.2d 612, 626 (5th Cir.1980).[15] Accordingly, defendants' motion to dismiss the UHP officials as individuals on the ground of eleventh immunity is denied.

## B. STANDING FOR INJUNCTIVE AND DECLARATORY RELIEF

The UHP and UHP officials next argue that the plaintiffs in this case lack standing to seek declaratory and injunctive relief. The court has already dismissed the claims for declaratory relief as a basis for damages against UHP or UHP defendants in their official capacities on grounds of eleventh amendment immunity. Plaintiffs,

> taxes levied against a private party is not enough to create tax immunity.... For the same reasons, a state should not be able to turn a purely intramural arrangement with its officers into an extension of sovereign immunity. Alternatively, the state's voluntary extension of indemnification could be construed as a waiver of eleventh amendment immunity.

L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 3–35, at 133 n. 22 (1978).

while not conceding that they lack standing individually, have moved to amend their complaint, and to certify a class, "in order to obviate any question regarding the personal standing of plaintiffs Schaefer, Hill and Dominguez." Memorandum in Opposition to Motions to Dismiss, at 35. The court concludes, however, that even if this case were certified as a class action there would be no standing to seek injunctive relief or prospective declaratory relief.

Standing is one aspect of the Article III limitation on federal judicial power that federal courts may entertain only "cases" or "controversies." *Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). To have standing to sue under this language plaintiffs "must demonstrate a personal stake in the outcome in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). To show the requisite personal stake, a plaintiff must demonstrate that she " 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *Id.* 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *Golden v. Zwickler*, 394 U.S. 103, 109–10, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969)).

In *City of Los Angeles v. Lyons*, the Supreme Court considered the requirements for standing in the context of a request for injunctive relief. In that case, the plaintiff had been stopped for a traffic violation, and though he offered no resistance, police officers had subjected him to a "chokehold" rendering him unconscious and otherwise damaging him. In his complaint against Los Angeles, the plaintiff sought injunctive relief.[16] The Supreme Court held that Lyons had "failed to demonstrate a case or controversy ... that would justify the equitable relief sought." *Id.* 461 U.S. at 105, 103 S.Ct. at 1667. The court reasoned that Lyons' standing "depended on whether he was likely to suffer future injury from the use of chokeholds by police officers." *Id.* The court observed that " '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.' " *Id.* at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974)). In other words, that Lyons had been choked illegally on a particular occasion did not establish a real and immediate threat that he would again be subjected to the same illegal conduct. "Absent a sufficient likelihood that he [would] again be wronged in a similar way, Lyons [was] no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* 461 U.S. at 111, 103 S.Ct. at 1670.[17]

In this case the court concludes that plaintiffs' complaint is similarly defective. Plaintiffs have not alleged, and it is unten-

**16.** Lyons's complaint originally sought damages, declaratory and injunctive relief in separate counts. The District Court granted the City's motion for judgment on the pleadings dismissing the declaratory and injunctive relief claims. The Court of Appeals reversed the judgment for the city, and the Supreme Court denied certiorari. 449 U.S. 934, 101 S.Ct. 333, 66 L.Ed.2d 158 (1980). On remand Lyons pressed only his claim for injunctive relief, which the District Court granted. The Court of Appeals affirmed this judgment, and the Supreme Court granted certiorari.

**17.** The court also noted that the equitable doctrine that cessation of challenged conduct does not bar an injunction was not applicable to Lyons, because Lyons' lack of standing did not rest on "termination of the police practice but on the speculative nature of his claim that he will again experience injury as a result of [the illegal] practice even if continued." *Lyons*, 461 U.S. at 109, 103 S.Ct. at 1669. In this regard defendants' argument that the UHP has terminated Wilcock's employment, and that Wilcock is in custody, also is not the appropriate basis for a determination of lack of standing.

able to assert, that troopers with the UHP routinely demand that citizens of the State of Utah engage in sexual relations with them, or routinely threaten citizens with arrest and bodily harm for not acceding to demands for sexual relations. Nor can plaintiffs tenably assert that the policies and practices of the UHP or its officials routinely result in admission to the UHP of persons who so behave. Without a showing of any continuing, present adverse effects, past exposure to this allegedly illegal conduct does not show a present case or controversy for purposes of injunctive relief.

■ Plaintiffs attempt to avoid this standing difficulty by seeking to amend their complaint and obtain certification as a class. However, this court finds no reason to believe that the requirements for standing to seek an injunction set forth in *Lyons* would be relaxed for class claims. Indeed, *Lyons* relies heavily on *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a class action in which the court found that none of the plaintiffs had standing. Plaintiff relies on *Lewis v. Tully*, 99 F.R.D. 632 (N.D.Ill.1983) where the court found class plaintiffs had standing despite the mandate of *Lyons*. This court disagrees with the *Lewis* court's conclusion.[18] But even if *Lewis* were persuasive, it is distinguishable from this case because in *Lewis* the court specifically found the threat of future harm credible and likely. *Id.* at 641. In this case, even if a class were certified, plaintiff has shown no reasonable probability that similar harm will occur in the future. For these reasons all

claims in which plaintiffs, whether individually or as a class, seek injunctive and prospective declaratory relief are dismissed.

## C. FAILURE TO STATE A § 1983 CLAIM AGAINST SUPERVISORS

Defendant UHP officials next argue that plaintiffs' case should be dismissed because allegations of "gross negligence" or "deliberate indifference" in qualifying, hiring, training, supervising, and retaining Wilcock do not amount to "deliberate action taken pursuant to official policy," which defendants contend is necessary to state a claim under § 1983. Memorandum in Support of UHP Motion to Dismiss, at 12 (as incorporated into Memorandum in Support of UHP officials Motion to Dismiss, at 11).[19] The UHP officials also contend that plaintiffs must allege that the UHP officials directly participated in the deprivation of plaintiffs' civil rights in order to satisfy the causation requirement of § 1983.

### 1. *Standard of Review*

In considering the defendant UHP officers' argument that plaintiffs have failed to state a claim, the allegations of plaintiffs' complaints must be taken as true and the complaint may be dismissed only if plaintiffs "can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Meade v. Merchants Fast Motorline, Inc.*, 820 F.2d 1124, 1125 (10th Cir.1987).

---

**18.** This court's conclusion that the Supreme Court would insist that its pronouncements in *Lyons* reach class actions seems to be recognized in the dissenting opinion in *Lyons:*

> The Court today holds that a federal court is without power to enjoin the enforcement of the city's policy, no matter how flagrantly unconstitutional it may be. Since no one can show that he will be choked in the future, no one—not even a person who, like Lyons, has almost been choked to death—has standing to challenge the continuation of the policy.

*Lyons,* 461 U.S. at 113, 103 S.Ct. at 1671 (Marshall, J. dissenting). As Judge Aspen has noted, "The dissenters probably would not have been so upset if they believed the holding in *Lyons*

did not reach class actions." *Williams v. City of Chicago,* 609 F.Supp. 1017, 1020 n. 7 (N.D.Ill. 1985).

**19.** Defendant UHP officials also argue that counts ten through twelve of plaintiffs' complaints fail to state a § 1983 claim. On their face, these counts concern state law negligence claims, which are before this court under the theory of pendent jurisdiction. Defendants' arguments based on *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), discussed below, are inapplicable to these counts, which do not assert § 1983 claims.

### 2. State of Mind Required for a § 1983 "Deprivation"

 Section 1983 imposes liability only if there has been a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In *Parratt v. Taylor*, the United States Supreme Court held that § 1983 does not independently contain any state of mind requirement. 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and its companion case *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) specifically reaffirm this holding and recognize that any state of mind required to state a claim under § 1983 derives from *the constitutional provision in issue*, and not from § 1983 itself. However, *Daniels* and *Davidson* do partially overrule *Parratt.* They indicate that "the Due Process Clause [of the Fourteenth Amendment] is simply not implicated by a *negligent* act of an official causing *unintended* loss or injury to life, liberty or property." *Daniels*, 106 S.Ct. at 663 (emphasis added). These two cases address the impact of negligence upon an alleged "deprivation" of rights without due process of law, but leave open the impact of negligence upon deprivation of other constitutional rights under Section 1983.[20]

*Daniels* and *Davidson* do not apply to the case before the court for two reasons. First, plaintiffs' § 1983 claims against the UHP officials are all based on allegations of "gross negligence" or "deliberate indifference," and thus meet the threshold requirement of *Daniels* and *Davidson.* Second, *Daniels* and *Davidson* do not support

defendant's argument of lack of liability in UHP officials. Section 1983, by its terms, renders liable in damages any person who "subjects *or causes to be subjected,* any [person within the jurisdiction of the United States] to the deprivation of any rights privileges, or immunities secured by the Constitution...." In this case, plaintiffs allege that Wilcock, *not the UHP officials,* subjected them to a deprivation of their civil rights. *Daniels* and *Davidson* deal with the state of mind required to effect such a deprivation. The question presented here with regard to the UHP officials is not whether a deprivation of a civil right took place, but rather whether the UHP officials *caused* a deprivation to take place. The UHP officials have not argued seriously that plaintiffs' allegations with regard to intentional conduct on the part of Wilcock do not meet *Daniel*'s and *Davidson*'s state of mind requirement, amounting to a clear deprivation of constitutional rights. Plaintiffs allege the UHP officials are liable under section 1983 for *causing* the deprivation by allegedly grossly negligently hiring, training, supervising, and retaining Wilcock. The state of mind of the UHP officials is relevant to whether they may be said to have so *caused* a deprivation of civil rights.

### 3. Causation

The UHP officials contend that the causation requirement of section 1983 is met only if a supervisor has *directly participated* in the improper action. In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed. 2d 561 (1976), the Court held that supervisory police officials cannot be liable for police officer misconduct absent a showing

---

**20.** The holdings of those cases are limited to deprivations of life, liberty, or property under the Due Process Clause of the Fourteenth Amendment. *Daniels*, 106 S.Ct. at 666; *Davidson*, 106 S.Ct. at 670 (following *Daniels* ). The Court specifically left open "the possibility that there are other constitutional provisions that would be violated by mere lack of care." *Daniels*, 106 S.Ct. at 666. Further, *Daniels* and *Davidson* themselves, and recent Tenth Circuit authority, indicate that "in any given section 1983 action, the court must determine the state of mind, if any, necessary to violate the constitutional provision at issue." *Specht v. Jensen,*

832 F.2d 1516, 1521 (10th Cir.1987); *Daniels*, 106 S.Ct. at 664, 666; *Davidson*, 106 S.Ct. at 670; *Trujillo v. Board of County Commissioners*, 768 F.2d 1186, 1189 (10th Cir.1985); *McKay v. Hammock*, 730 F.2d 1367, 1373 (10th Cir.1984) (en banc). In this case plaintiffs allege violations of their rights under the first, fourth, ninth, and fourteenth amendments. The state of mind required to effect a deprivation of rights under at least some of these amendments would have to be determined. *See Specht v. Jensen,* At 1522–23 (finding no state of mind requirement for violation of Fourth Amendment).

of an "affirmative link" between the misconduct complained of and any action by the supervisors. *Id.* at 371, 96 S.Ct. at 604. The Tenth Circuit has also recognized that supervisors may not be held liable under § 1983 unless an "affirmative link" exists between supervisor's action, or inaction, and the constitutional violation. *McKay v. Hammock,* 730 F.2d 1367, 1374 (10th Cir. 1984); *McClelland v. Facteau,* 610 F.2d 693, 695–96 (10th Cir.1979). Similarly, in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the Court examined the causation requirement in the case of municipalities and concluded that a municipality [21] (or supervisor) could not be held liable for a civil rights violation inflicted by an employee based on a respondeat superior theory.[22] *Id.* at 691, 98 S.Ct. at 2036. The court held that the causation language of § 1983 should not be construed to include any notion of vicarious liability based solely on an employer-employee relationship, but that an employee's tort became an employer's liability only if the employer "caused" the employee to subject another to the tort. *Id.* at 692, 98 S.Ct. at 2036.

■ In more recent cases the Court has re-emphasized that an employer's "fault" or "responsibility" is prerequisite to liability under § 1983. In both *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court specifically noted that supervisor liability required a "fault based" analysis. In *Tuttle,* Justice Rehnquist, in his plurality opinion, observed that a city should not be held liable for inadequate training of police officers based exclusively on one incident of police misconduct. Such liability, he noted, could then be found

even in the face of uncontradicted evidence that the municipality scrutinized each police applicant and met the highest training standards imaginable. To impose liability under those circumstances would be to impose it simply because the municipality hired one "bad apple."

*Tuttle,* 471 U.S. at 821, 105 S.Ct. at 2435. Justice Brennan, in his concurring opinion, noted that a single police officer's gross misconduct might be

attributable to numerous other factors for which the city may not be responsible; the police officer's own unbalanced mental state is the most obvious example. In such a case, the city itself may well not bear any part of the *fault* for the incident; there may have been nothing that the city could have done to avoid it. Thus, without some evidence of municipal policy or custom independent of the police officer's misconduct, there is not any way of knowing whether the city is at *fault.*

*Id.* at 831, 105 S.Ct. at 2440 (citation omitted and emphasis added). In *Pembaur,* Justice Brennan stated in part II–A of his plurality opinion that *"Monell* is a case about *responsibility,"* and that "municipal liability is limited to action for which the municipality is actually *responsible."* *Pembaur,* 106 S.Ct. at 1297–98 (emphasis added). "[W]here action is directed by those who establish governmental policy, the municipality is equally *responsible* whether that action is to be taken only once or to be taken repeatedly." *Id.* at 1299 (emphasis added). Thus, in any supervisory liability case under § 1983 the proper question is whether the supervisor may fairly be said to be responsible for the deprivation of a person's civil rights.

---

**21.** In *Monell* the court made clear that its analysis of suits against the municipality itself applied equally to suits against municipal officials in their official capacity. *Monell,* 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55.

**22.** *Monell* established a two-part requirement for liability in official-capacity suits or suits against a governmental entity. First, *Monell* required that the entity or supervisor "cause" an employee to subject another to a deprivation of

the other's federal rights. *Monell,* 436 U.S. at 692, 98 S.Ct. at 2036. Second, *Monell* required that a governmental entity "policy or custom" must play a part in the deprivation of federal rights. *Id.* at 694, 98 S.Ct. at 2037. But in this case only a personal-capacity suit remains, and therefore the "policy or custom" requirement need not be shown by the plaintiffs. *See Graham,* 473 U.S. at 166, 105 S.Ct. at 3106.

In cases dealing with assertions of liability against supervisors under § 1983, the Tenth Circuit has held the "affirmative link" or "causation" requirement to be met in a number of ways. First, the requirement may be met by an allegation that the supervisor directly participated in the deprivation of constitutional rights. *McKay v. Hammock*, 730 F.2d 1367, 1374 (10th Cir.1984). Second, Tenth Circuit cases clearly hold that a § 1983 claim may be asserted against supervisors based on allegations of "gross negligence" in hiring, training and supervising employees. *Rock v. McCoy*, 763 F.2d 394, 397 (10th Cir.1985); *see McClelland v. Facteau*, 610 F.2d 693, 696 (10th Cir.1979); *cf. Cowdrey v. City of Eastborough*, 730 F.2d 1376, 178–79 (10th Cir.1984) (summary judgment granted where plaintiff failed to rebut city's evidence that it had not been reckless in hiring, training, or supervising its police officers); *Dewell v. Lawson*, 489 F.2d 877, 881–82 (10th Cir.1974) (grossly incompetent or inadequate failure to train police officers states § 1983 claim for violation of eighth amendment right against cruel and unusual punishment).[23] Third, the Tenth Circuit has held that a supervisor's failure or refusal to act on knowledge of prior misbehavior by employees may satisfy the causation requirement. *See Cowdrey*, 730 F.2d at 1379; *McClelland*, 610 F.2d at 696. Causation thus includes a state of mind requirement for supervisors when used in the context of a failure to train, supervise, retain, hire and qualify employees.

Plaintiff's allegations clearly meet this burden. Plaintiff has alleged that UHP officials were grossly negligent in hiring, training, supervising, and retaining Wilcock, and that their gross negligence proximately caused plaintiffs' injuries. Plaintiffs have also alleged that UHP officials knew of Wilcock's prior misconduct and failed to act to prevent future harm.

The court, therefore, holds that plaintiffs' allegations of the UHP officials' gross negligence in qualifying, hiring, training, supervising, and retaining Wilcock, and the UHP officials' failure to act on Wilcock's known misconduct, satisfy the deprivation and causation requirements and thus state a claim under § 1983.

## D. QUALIFIED IMMUNITY

Defendants finally argue that they are entitled to qualified immunity as a matter of law, and that plaintiffs' suits are therefore entirely barred. The court notes preliminarily that qualified immunity does not extend to suits against officials in their official capacities. *Brandon v. Holt*, 469 U.S. 464, 472–73, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985); *Owen v. City of Independence*, 445 U.S. 622, 634 n. 14, 100 S.Ct. 1398, 1407 n. 14, 63 L.Ed.2d 673 (1980); *McKay v. Hammock*, 730 F.2d 1367, 1374 (10th Cir.1984). Nor does it bar declaratory or injunctive relief. *Pulliam v. Allen*, 466 U.S. 522, 536–43, 104 S.Ct. 1970, 1977–81, 80 L.Ed.2d 565 (1984); *Supreme Court v. Consumer's Union*, 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Since only personal-capacity suits for damages remain in this action, the court merely observes that in cases where claims against officials in their official capacities or claims for injunctive or declaratory relief remain viable, qualified immunity would not of itself be completely dispositive were the court to grant it as a matter of law.

### 1. *Legal Principles*

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) the Supreme Court held that, "government officials performing discretionary functions generally are shielded

---

**23.** Courts in other circuits have also held that allegations that supervisors were "grossly negligent" or "deliberately indifferent" in hiring, supervising, and training employes states a cause of action under § 1983. *Bergguist v. County of Cochise*, 806 F.2d 1364, 1369–70 (9th Cir.1986); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986); *Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir.1985); *Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984); *Languirand v. Hayden*, 717 F.2d 220, 227–28 (5th Cir.1983); *Hays v. Jefferson County*, 668 F.2d 869, 873–74 (6th Cir. 1982); *Owens v. Haas*, 601 F.2d 1242, 1246 (2d Cir.1979); *Leite v. City of Providence*, 463 F.Supp. 585, 590–091 (D.R.I.1978).

from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The court noted that reliance on this standard of objective reasonableness, or objective legal reasonableness as measured by clearly established law, is necessary to "avoid excessive disruption of government and [to] permit the resolution of many insubstantial claims on summary judgment." *Id.*

█ The court's most recent explication of the *Harlow* standard was made in *Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In that case the court clarified the application of the *Harlow* standard, noting that the operation of the *Harlow* standard,

> depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Id.* at 3039. The court made clear the *Harlow* standard was improperly applied at this level of abstract generality. The court then stated that,

> [t]he contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless

the very action in question has previously been held unlawful. . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* (citations omitted). After *Creighton* it is clear that not only the right but also the unlawfulness of the official's conduct in light of that right must be clearly established. Analysis of the availability of immunity under *Harlow* and *Creighton* involves two steps: (1) the court must determine whether the right allegedly violated was "clearly established at the time [the] action occurred." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; and (2) the court must make a more particularized determination that "the contours of the right [were] sufficiently clear that a reasonable official would understand [his conduct in a particular case] violates that right." *Creighton,* 107 S.Ct. at 3039.

### 2. *Application in this Case*

█ This case does not squarely fit in the *Harlow* and *Creighton* analysis. Here, plaintiffs assert liability against supervising UHP officials for *causing* them to be subjected to a deprivation of their civil rights. Plaintiffs' theory is that the supervisors, by improperly fulfilling their duties as such, caused plaintiffs to be subjected to a deprivation of their civil rights. To state such a claim in the Tenth Circuit, plaintiffs must allege that the supervisors acted at least grossly negligently in fulfilling their duty to supervise individual peace officers. Given those allegations, it is somewhat contradictory to argue, as defendants have argued, that even though a supervisor may have been grossly negligent and thereby caused plaintiffs' injury, he is nevertheless immune from suit because he acted objectively reasonably in thinking that he could be grossly negligent. However, the court need not address that matter because even applying *Harlow* and *Creighton* as the defendants would have the court do, immunity is not available to them as a matter of law at this stage of the litigation. The pertinent allegations with respect to the UHP officials' defense of qualified immunity are that the defendant officials acted in a grossly negligent or deliberately indiffer-

ent manner in qualifying, hiring, training, supervising, and retaining Wilcock and that the officials failed to act to prevent future harm even after they had knowledge of Wilcock's prior misbehavior. Plaintiffs specifically allege that all UHP officials were grossly negligent in performing a pre-employment background check, in ignoring reservations expressed against Wilcock, in giving no regard to Wilcock's difficulties at the police academy, in not requiring period-ic reevaluations of troopers, in retaining Wilcock despite knowledge of deficiencies in his judgment, and in their investigation of complaints made against Wilcock. As the court previously noted, where a motion to dismiss is based on the sufficiency of plaintiffs' allegations, the court must ac-cept the allegations as true and dismiss the complaint only it if appears plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. De-fendants contend they are nevertheless im-mune because there is no clearly estab-lished right to be free from the effects of improper supervision, or in the alternative, that the defendant officials reasonably could have thought their actions lawful.

Since at least 1980 it has been the clear law of the Tenth Circuit that a supervisor could be liable under § 1983 for causing a deprivation of civil rights if the supervisor was grossly negligent in supervising em-ployees, and as a result the employees de-prived someone of civil rights. *Rock v. McCoy,* 763 F.2d 394, 397 (10th Cir.1985); *McClelland v. Facteau,* 610 F.2d 693, 696 (10th Cir.1979). It was also clearly estab-lished that a supervisor could be liable sim-ilarly for his failure to act on knowledge of an officer's prior misbehavior. *Cowdrey v. City of Eastborough,* 730 F.2d 1376, 1378–79 (10th Cir.1984); *McClelland,* 610 F.2d at 696. Thus, the defendants cannot claim that it was objectively reasonable in light of clearly established law to grossly negli-gently supervise employees, nor that there was no clearly established right to be free

from the consequence of improper supervi-sion.[24] The fact patterns presented in these Tenth Circuit cases establish con-tours of a law enforcement supervisor's duty to supervise. These are sufficiently clear so that a reasonable supervisor would understand that gross negligence in any of the respects specifically alleged above is unlawful, and that it may render the super-vising officer liable for injury caused there-by. Additionally, defendants do not con-tend that plaintiffs' rights allegedly de-prived by Wilcock were not clearly estab-lished, nor do they contend that Wilcock reasonably could have thought his actions to be lawful. Thus, the court cannot at this stage of the litigation find the defend-ants immune from suit.

The court notes, however, that both *Har-low* and *Creighton* urge resolution of im-munity questions "at the earliest possible stage of a litigation," *Creighton,* 107 S.Ct. at 3042 n. 6; *see Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2737–38, and state that discovery, if necessary, "should be tailored specifically to the question of [defendants] qualified immunity." *Creighton,* 107 S.Ct. at 3942–43 n. 6. Here the court has found that defendants reasonably must have been aware of their obligation to refrain from acting grossly negligently. The questions upon which both plaintiffs' claims and de-fendants' immunity turn are what each of the UHP official defendants knew or rea-sonably should have known, and what each did or reasonably should have done in su-pervising UHP troopers. The court has assumed for purposes of this motion that the allegations of the complaint are true with respect to each individual defendant. It may well be, however, that not every defendant charged had sufficient responsi-bility or involvement to be held liable. This is necessarily a fact-bound inquiry. In this case, it is "inescapable ... that some mea-sure of discovery [is] required to determine exactly what [the UHP] official defend-ant[s] did know at the time of [their] ac-

---

**24.** The defendant's particular phrasing of the immunity issue confuses plaintiffs' claim. Plaintiffs do not claim a constitutional right to be free from any and all effects of improper supervision. Rather, plaintiffs claim a right to be free from *deprivation* of constitutional rights, and that the defendants' gross negligence caused a deprivation of those constitutional rights. Li-ability of supervisors under § 1983 is based upon *causing* such a deprivation.

tions." *Harlow*, 457 U.S. at 821, 102 S.Ct. at 2740 (Brennan, J., concurring). Of course, summary judgment, if appropriate, remains available on this issue to particular defendants after further discovery.

## II. MOTION FOR SUMMARY JUDGMENT BY SOCIAL WORKER, DEFENDANT ERIC NIELSEN

Defendant Eric Nielsen argues that he is entitled to summary judgment because he was not a state actor for purposes of § 1983, there was no causal link between his actions and Wilcock's alleged actions, and plaintiffs' claims are not cognizable under § 1983. In the alternative, Nielsen argues that he is entitled to qualified immunity for his actions.

### A. THE SUFFICIENCY OF THE RECORD BEFORE THE COURT

Nielsen's motion in this case was filed two months after Nielsen was served. The sole support for Nielsen's motion is his affidavit. In opposition, plaintiffs have filed a memorandum, and the affidavit of Kathryn Collard. In her affidavit Collard states that Nielsen's contentions are predicated upon facts which plaintiffs cannot reasonably oppose without opportunity for further discovery in this action. The court notes that virtually no discovery has proceeded against defendant Nielsen. With the exception of the questions discussed below, it appears that resolution of the issues presented in Nielsen's motion requires further discovery. Accordingly, the court reserves ruling on Nielsen's motion under Rule 56(f) until further discovery is conducted. In this regard the court orders that the depositions of Eric Nielsen and Newell Knight be taken as soon as possible, and that the parties submit further briefs after such discovery is taken.

### B. UNDER COLOR OF STATE LAW

Nielsen argues that he may not be considered to be a state actor under § 1983 for simply performing the psychological assessment of Wilcock because he was an independent contractor and because he derived only a small portion of his income from the contract. Nielsen's argument relates to the § 1983 requirement that a person must act "under color of any statute, ordinance, regulation, custom, or usage of any state," and to the fourteenth amendment, which provides in part: "No *state* shall make or enforce any law which shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added).

Plaintiffs' causes of action are based on the fourteenth amendment, or the Bill of Rights as incorporated into the fourteenth amendment. In cases involving fourteenth amendment violations, the "under color of" law and state action requirements are substantially the same. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928, 935 n. 18, 102 S.Ct. 2744, 2752 n. 18, 73 L.Ed.2d 482 (1982); *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). Therefore, § 1983 regulates state and local government conduct, but not purely private conduct.

A private party's conduct may be state action for purposes of § 1983 if "the deprivation of a federal right [may] be fairly attributable to the state." *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753. In this regard, the United States Supreme Court has found state action in three general areas: (1) where the state and private party or entity maintain a sufficiently interdependent or symbiotic relationship; (2) where the state requires, encourages, or is otherwise significantly involved in nominally private conduct; and (3) where the private party or entity exercises a traditional state function. *See, e.g., Lombard v. Louisiana*, 373 U.S. 267, 273–74, 83 S.Ct. 1122, 1125, 10 L.Ed.2d 338 (1963); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961); *Marsh v. Alabama*, 326 U.S. 501, 507–08, 66 S.Ct. 276, 279, 90 L.Ed. 265 (1946). However, the court has also emphasized that the state action inquiry must be made on a case-by-case basis. *Burton*, 365 U.S. at 722, 81 S.Ct. at 860.

**1110**

In this case the court need go no further than a discussion of the exercise of traditional state function by a private person in order to find that defendant Nielsen's conduct was performed "under color of state law." Nielsen has not contended that the implementation and operation of a police department is not a traditional state function. In *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed. 2d 245 (1976), *overruled on other grounds, Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court held that police departments provide "an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens." *Id.* 426 U.S. at 855, 96 S.Ct. at 2476. The qualifying and hiring of police officers is an integral part of this traditional state function.

At a minimum, Nielsen was involved in qualifying Wilcock to become a UHP Trooper. Nielsen, under contract with the state of Utah, performed the initial psychological assessment on Wilcock sometime before June 21, 1984, and before the UHP hired Wilcock. The psychological assessment was performed as required by Utah law. The state delegated to Nielsen determination of Wilcock's emotional and mental qualifications. If Nielsen had found any emotional or mental conditions that could have adversely affected Wilcock's performance as a UHP Trooper, Wilcock would not have been qualified to be a Trooper under Utah law. State delegation of a traditional state function to a private party makes that party's action state action. *See Smith v. Allwright,* 321 U.S. 649, 660, 64 S.Ct. 757, 763, 88 L.Ed. 987 (1944). Also, a state may not attempt to avoid its constitutional duties by deliberately delegating public service tasks to private parties. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 842 n. 7, 849 n. 3, 102 S.Ct. 2764, 2772 n. 7, 2776 n. 3, 73 L.Ed.2d 418 (1982) (majority opinion and Marshall, J., dissenting).

The Supreme Court more recently has limited the state function doctrine to delegated powers "traditionally associated with sovereignty." *Jackson v. Metropoli-*

*tan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974). The Court also has held that delegation of commercial functions to private parties does not make state action out of the exercise of those functions by the private party. *Flagg Brothers v. Brooks,* 436 U.S. 149, 162, 98 S.Ct. 1729, 1736, 56 L.Ed.2d 185 (1978). However, in the case at bar the delegated power related to a police department, the noncommercial functions of which the Supreme Court has found to be traditional state functions. *Garcia* at 469 U.S. 855. It is apparent in this case that Nielsen was a part of the qualifying and hiring process, exercising a traditional state government function. Nielsen thusly was a state actor for purposes of this case, and therefore acted "under color of" law for § 1983 purposes. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 2752 n. 18, 73 L.Ed.2d 482 (1982). Plaintiffs' allegations of inadequate conduct on Nielsen's part while qualifying Wilcock implicate a possible misuse of power. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of the state, is action taken 'under color of' state law." *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) (followed in *Monroe v. Pape,* 365 U.S. 167, 184, 187, 81 S.Ct. 473, 482, 484, 5 L.Ed.2d 492 (1961)).

### C. DEPRIVATION OF A RIGHT

Nielsen argues that plaintiffs' complaints allege mere negligence against him and do not allege anything but state law torts not cognizable under § 1983. Nielsen is named in count two of the complaint, a section 1983 claim in which plaintiffs allege "gross negligence" or "deliberate indifference" in qualifying, hiring, training, supervising, and retaining Wilcock, and he is named in count eleven, which is a state law negligence claim. Nielsen's arguments based on *Daniels* and *Davidson,* are thus inapplicable to both counts, and provide no basis for granting summary judgment. *See* Part I. C. 2 above.

This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.